Richardson, J., filed the order of the Court in which Keller, P.J., and Meyers, Johnson, Keasler, and Newell, JJ ., joined.
Rolando Ruiz filed a post-conviction application for a writ of habeas corpus pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071 § 5, a motion to reconsider a previously filed application, and a motion to stay the execution. By order dated August 26, 2016, this Court stayed Ruiz's execution date but did not rule on his application and motions. After reviewing Ruiz's writ application, for the reasons discussed below, we dismiss this application as a subsequent writ because it fails to satisfy the requirements of Article 11.071 § 5 ; we decline to reconsider Ruiz's prior subsequent writ application; we withdraw our previously issued stay of execution; and we deny Ruiz's motion to stay the execution.
On the night of July 14, 1992, Ruiz fatally shot Theresa Rodriguez in the head. He had been hired by her husband and brother-in-law to kill her. They agreed to pay Ruiz $2,000.00-$1,000.00 as a down payment and $1,000.00 after the killing. At his 1995 trial, Ruiz admitted that he killed Theresa.[1] The jury convicted Rolando Ruiz of the offense of capital murder. As a result of the jury's answers to the special issues submitted pursuant to Texas Code of Criminal Procedure Article 37.071, the trial court sentenced Ruiz to death. This *807 Court affirmed Ruiz's conviction and sentence on direct appeal.[2] Rolando Ruiz does not contest his guilt.[3] He just doesn't want to be executed. Neither did Theresa Rodriguez.
Ruiz comes to this Court again seeking relief based on his claims that his trial counsel was ineffective during the punishment phase of trial. However, the merits of Ruiz's claims of ineffective assistance of trial counsel have been completely and thoroughly reviewed. Ruiz is not entitled to relitigate claims that have already been resolved on the merits.[4] In order to understand the reasoning behind the Court's decision, it is necessary to recount in some detail the post-conviction procedural posture.
HABEAS BACKGROUND IN CHRONOLOGICAL ORDER
A. First State Writ (WR-27,328-02)
On September 15, 1997, Ruiz filed his first post-conviction application for writ of habeas corpus under Texas Code of Criminal Procedure, Article 11.071. Ruiz's habeas counsel did not raise ineffective assistance of trial counsel (sometimes referred to herein as "IAC") as a ground for relief. The trial court held an evidentiary hearing and issued findings of fact and conclusions of law recommending that relief be denied. By order dated April 2, 2003, this Court denied relief.[5]
B. First Federal Writ
On February 18, 2004, represented by new counsel, Ruiz filed a federal habeas corpus petition in the United States District Court for the Western District of Texas. In his federal petition, Ruiz raised claims of ineffective assistance of trial counsel[6] and ineffective assistance of state habeas counsel. In an opinion issued on August 29, 2005, the federal district court held that Ruiz had procedurally defaulted on his claims for federal habeas relief. The federal district court held as follows:
*808 While a showing of ineffective assistance can satisfy the "cause" prong of the "cause and actual prejudice" exception to the procedural default doctrine, deficient performance, or even gross incompetence, by [Ruiz's] state habeas counsel does not satisfy either prong of the Strickland v. Washington test for ineffective assistance because [Ruiz] possessed no constitutional right to the assistance of counsel during his state habeas corpus proceeding. Both the Supreme Court and Fifth Circuit have held that, because there is no constitutional right to the assistance of counsel in connection with a collateral attack upon an otherwise final conviction, error by counsel in an earlier state or federal habeas proceeding cannot give rise to a federal habeas claim or constitute "cause" for purposes of avoiding a procedural default.[7]
The federal district court concluded that, "[t]he inexplicable failure of [Ruiz's] state habeas counsel to raise any of these claims during [Ruiz's] state habeas corpus proceeding has effectively cut off federal habeas review of [Ruiz's] most compelling claims herein."[8]
On October 12, 2005, Ruiz filed in federal district court a request for a Certificate of Appealability, arguing that his
procedural defaults should be excused by virtue of the inherent unfairness of (1) permitting the State of Texas to designate the indigent petitioner's state trial counsel to serve as [Ruiz's] direct appeal counsel against [Ruiz's] express wishes and over [Ruiz's] objections and (2) effectively insulating that breach of fundamental fairness by permitting the State of Texas then to appoint a wholly incompetent state habeas counsel to represent [Ruiz] in the one and only forum in which [Ruiz] had an opportunity to raise ineffectiveness by his trial and appellate counsel before the state courts.[9]
While recognizing the inherent inequities of Ruiz's situation, the federal district court continued to maintain the position that Ruiz was not entitled to relief:
Unfortunately, the fundamental unfairness of [Ruiz's] state habeas corpus proceeding does not furnish a basis for federal habeas relief. Infirmities in state habeas corpus proceedings do not constitute grounds for federal habeas relief.
Furthermore, the Supreme Court and Fifth Circuit have held that because there is no constitutional right to the assistance of counsel in connection with a collateral attack upon an otherwise final conviction, error by counsel in an earlier state or federal habeas proceeding cannot give rise to a federal habeas claim or constitute "cause" for purposes of avoiding a procedural default.
The Court is not unsympathetic to [Ruiz's] plight. Quite frankly, the quality of representation [Ruiz] received during his state habeas corpus proceeding was appallingly inept. [Ruiz's] state habeas counsel made no apparent effort to investigate *809 and present a host of potentially meritorious and readily available claims for state habeas relief. Furthermore, [Ruiz's] state habeas counsel made virtually no effort to present the state habeas court with any evidence supporting the vast majority of the claims for state habeas relief which said counsel did present to the state habeas court. More specifically, [Ruiz's] state habeas counsel not only inexplicably failed to present Dr. Munsinger's[10] testimony or any of the other, additional, allegedly mitigating evidence [Ruiz] complains in this Court his trial counsel should have presented during the punishment phase of [Ruiz's] trial but [Ruiz's] state habeas counsel failed to present the state habeas court with any claim for state habeas relief alleging this glaringly obvious failure by [Ruiz's] trial counsel constituted ineffective representation. [Ruiz's] state habeas counsel did little more than (1) assert a set of boilerplate, frivolous, claims which had repeatedly been rejected by both the state and federal courts and (2) fail to support even these claims with any substantial evidence. Insofar as [Ruiz] contends his state habeas counsel merely "went through the motions" and "mailed in" a frivolous state habeas corpus application which said counsel failed to support with evidence, those complaints have merit. Wholly inept though it may have been, under the well-settled authorities ... the egregiously deficient performance of [Ruiz's] state habeas counsel does not excuse the procedural defaults arising therefrom ....[11]
The federal district court labeled Ruiz's state habeas counsel as "wholly incompetent" and "egregiously inept,"[12] while also pointing out that Ruiz's habeas counsel "did little more at the evidentiary hearing held in [Ruiz's] state habeas corpus proceeding than furnish the Bexar County District Attorney's office with an opportunity to elaborate on why that office chose to seek [the] death penalty."[13] Yet, the federal district court held that it was without authority to grant relief.
C. Second State Writ (WR-27,328-03)
On July 2, 2007, Ruiz filed a subsequent writ application in state court, claiming ineffective assistance of trial counsel.[14] He asserted that his trial counsel performed deficiently by failing to investigate and present mitigating evidence at the punishment phase of trial. In that subsequent writ application, Ruiz also alleged that his habeas counsel appointed to file his first writ application performed deficiently by not raising ineffective assistance of trial counsel in his initial application. This Court did not address the merits of Ruiz's IAC claims, and we did not address his claim of ineffective assistance of habeas counsel. This Court issued a brief order dated July 6, 2007, dismissing Ruiz's second writ application because it did not meet the requirements of *810 Article 11.071, Section 5.[15] Only seven members of the Court participated in this ruling. Of the seven, five judges voted to dismiss and two judges (Holcomb, J. and Johnson, J.) dissented to the dismissal of the application.[16] Judge Womack, who joined the Court's order dismissing Ruiz's subsequent application, filed a "statement respecting the dismissal of the application."[17]
D. Federal Motion To Stay His Execution
Three days later, Ruiz was back in federal district court. On July 9, 2007, Ruiz filed a motion to stay his execution. Ruiz asserted that this Court's dismissal of his second writ application constituted a ruling on the merits of his IAC claims, which would now allow him to argue this ground in federal district court. However, the federal district court disagreed, holding that, "[b]ecause the state appellate court dismissed [Ruiz's] second state habeas application on state writ-abuse principles, [Ruiz] has procedurally defaulted on those claims for purposes of federal habeas review."[18] The federal district court's determination that Ruiz's claim of ineffective assistance of trial counsel was procedurally defaulted was based on its conclusion that the state court to which he would be required to petition would now find the claims procedurally barred. The federal district court determined that Ruiz was not entitled to relief from its final order of August 29, 2005, which denied him federal habeas relief.[19]
E. First Appeal to the Fifth Circuit
Ruiz immediately appealed the federal district court's 2005 decision to the Fifth Circuit in an attempt to get a stay of his impending execution. Recognizing the procedural quagmire[20] caused by the state habeas counsel's poor performance, the Fifth Circuit granted Ruiz a stay and sent the case back to the federal district court to address the merits of Ruiz's IAC
*811 claims.[21] The Fifth Circuit decided that the two dissenting statements and one "statement respecting the dismissal of the application" accompanying this Court's per curiam order reflected that this Court had reviewed the merits of Ruiz's IAC claims, and he was therefore entitled to proceed with his federal writ. The Fifth Circuit closely scrutinized these statements filed by three of the seven judges on this Court participating in the case[22] and held that they "relay[ed] the decision path of the court."[23] Specifically, the Fifth Circuit read into this Court's collective resolution as "preserv[ing] for another day the question whether the obvious deficiencies in the performance of state habeas counsel excused a failure to present the claims of ineffective trial counsel in a first state petition."[24] And, "[p]reserving this issue makes sense only if the CCA had rejected the claim of ineffective trial counsel on its merits rather than because it was not presented in Ruiz's first state habeas petition."[25] Citing to Michigan v. Long ,[26] the Fifth Circuit concluded, based on Judge Womack's "statement respecting the dismissal of the application," that there was not a majority of five Court of Criminal Appeals judges who decided the outcome of the subsequent writ "on an independent and adequate state ground."[27] The Fifth Circuit's holding was a determination that this Court had addressed the merits of Ruiz's IAC claims:
The federal court below would have had no federal claim before it if, as the district court concluded, the CCA applied an independent and adequate state law ground to deny relief. ...
In deciding whether the CCA refused relief upon an independent state-law ground or upon the merits of Ruiz's petition we are aided by the bright light of Michigan v. Long :
when ... a state court decision fairly appears to rest primarily on federal law, or to be interwoven with federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so. [ Michigan v. Long , 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) ]
This settled principle gives to state courts control over the federal review of their opinions .... To the point, that the CCA did not make clear that its decision rested on an independent state ground opens the merits of Ruiz's Wiggins claim to federal review. At best, the CCA did not make clear whether it relied on state or federal law in dismissing Ruiz's application. As the CCA is keenly aware, its choice of language was made against a background legal standard-which directs the CCA in either granting an application for consideration of subsequent claims or dismissing that application *812 as an abuse of the writ-that is interwoven with federal law.
The Texas Code of Criminal Procedure, as interpreted by the CCA, provides for subsequent applications where (1) the factual or legal basis for the subsequent claim was previously unavailable and (2) where the facts alleged would constitute a federal constitutional violation that would likely require relief from either the conviction or sentence [citing Ex parte Campbell , 226 S.W.3d 418, 421 (Tex. Crim. App. 2007) ]. The boilerplate dismissal by the CCA of an application for abuse of the writ is itself uncertain on this point, being unclear whether the CCA decision was based on the first element, a state-law question, or on the second element, a question of federal constitutional law.
In any event the decisional basis here is uncertain .... Even if it were clear, the four-Judge plurality was not controlling.
Setting aside the intricacies of the CCA's voting requirements, both the concurring and dissenting opinions, by their unanswered language, strongly suggest that the CCA debated and reached the federal merits question, not the independent state law ground.
... In sum, the three opinions from the seven judges together do not clearly rest on an independent and adequate state ground. Even if the order of the four-Judge plurality alone left the decisional footing certain, and it did not, Judge Womack's opinion, necessary to the court's judgment, pushes the court toward a clear merit ruling, and in any event deprives the plurality of a fifth vote on an independent and adequate state ground. This leaves the decisional path far short of the clarity insisted upon by Michigan v. Long , to which the district court paid no mind and of which the CCA is acutely aware.[28]
The Fifth Circuit also believed that "[e]quity would not deny Ruiz a hearing on the merits"[29] of his IAC claim.
Ruiz brings serious charges of incompetent and ineffective trial counsel, but no federal court has considered the merits of his constitutional claims, and he obtained a stay only within minutes of his execution, granted by this court in order to gain sufficient time to consider properly the appeal. After further briefing and oral argument, we continue the stay of execution, reverse the judgment dismissing the federal habeas petition and remand with instruction to the federal district court to decide the claim of ineffective trial counsel on its merits after any further proceedings necessary to do so.[30]
Thus, said the Fifth Circuit, "Ruiz's Wiggins claim was properly before the federal district court," and it should have addressed the merits of that claim.[31] The Fifth Circuit remanded the writ so that the federal district court could address the merits of Ruiz's now exhausted IAC claims.
THE FEDERAL DISTRICT COURT'S ANALYSIS OF THE MERITS OF
*813 RUIZ'S IAC CLAIMS [32]
After the Fifth Circuit remanded the case to the federal district court, Ruiz filed an amended petition, dated January 20, 2009, alleging the following claims of ineffective assistance of trial counsel with regard to the punishment phase of Ruiz's trial:
1. Trial counsel failed during the punishment phase to present mitigating evidence readily available through Dr. Henry Munsinger (the state-court-appointed mental health expert who had examined Ruiz).
2. Trial counsel failed to conduct an adequate investigation into Ruiz's background for additional mitigating evidence (which Ruiz claimed would have produced additional mitigating evidence establishing the very difficult circumstances of his childhood, as well as his long history of substance abuse).
3. Trial counsel should have retained the services of a mental health professional who could have opined regarding the impact of Ruiz's alleged cocaine addition on his conduct at the time of the offense.
The case was pending in the federal district court for more than three years, underwent "extensive investigation by [Ruiz's] federal habeas counsel,"[33] and resulted in "the expenditure of thousands of dollars of investigative and expert expenses."[34] The federal district court conducted a two-day evidentiary hearing (November 2-3, 2010) on Ruiz's IAC claims.
The federal district court issued its opinion on April 6, 2011. In that opinion, the federal district court relayed the "highly atypical procedural history of this cause."[35] Not hiding its displeasure with the Fifth Circuit's decision, the federal district court criticized, in two lengthy footnotes, the Fifth Circuit's remand order sending Ruiz's writ back to the federal district court to address his IAC claims.[36]
Citing to Strickland v. Washington[37] *814 and Wiggins v. Smith ,[38] the federal district court outlined the standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as guaranteed by the Sixth Amendment.[39] To prove ineffective assistance of counsel, the defendant must first show that counsel's performance was deficient-that it "fell below an objective standard of reasonableness."[40] Second, he must show that the deficient performance prejudiced his defense-that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different.[41] A habeas petitioner has the burden to prove both prongs of the Strickland ineffective assistance standard by a preponderance of the evidence.[42]
The federal district court's opinion then related the facts of the murder and the testimony presented at Ruiz's trial. Shortly after his arrest for Theresa Rodriguez's fatal shooting, Ruiz gave three written statements to police (on three separate dates) in which he described negotiating with Theresa's husband Michael and her brother-in-law Mark to murder Theresa in exchange for the sum of $2,000.00 and fatally shooting Theresa in the presence of Michael and Mark inside the garage of Theresa's and Michael's residence on the evening of July 14, 1992. Based on the information Ruiz gave to police, they recovered the handgun given to Ruiz by the Rodriguez brothers and the other handgun Ruiz actually used to kill Theresa, which matched the bullet removed from Theresa's head. In addition to the three highly inculpatory written statements given by Ruiz, the prosecution presented evidence showing that (1) the Rodriguez brothers behaved very suspiciously on the night of the murder, (2) they falsely told police that the person who shot Theresa had also stolen her purse, (3) shortly before Ruiz's arrest, the mother of one of his friends saw him counting hundred dollar bills, and (4) after his arrest, Ruiz called his friend from jail and confessed that he had killed "the girl from USAA" for the money.
The federal district court noted in its opinion that Ruiz took the stand against his trial counsel's advice and repeatedly denied knowing the Rodriguez brothers and denied killing Theresa for money. Ruiz's defense at trial was that his fatal shooting of Theresa was a random act of violence that he had committed while in a drug-induced stupor. He also denied that he had any affiliation with gang-related activities. The prosecution rebutted all of Ruiz's defensive claims with additional incriminating evidence.
After deliberating for a little more than two hours, Ruiz was found guilty by the jury. Thereafter, noted the federal district court, the prosecution presented punishment evidence.
• A 19-year-old female friend testified that, in the days immediately after the murder, Ruiz confessed to her that he had killed Theresa Rodriguez. She also testified that she successfully smuggled several marijuana joints to Ruiz when she visited him at Bexar County Adult Detention Center.
• Three close friends of Ruiz testified: that he knew and associated with *815 Mark Rodriguez; that he liked to fight; and that he sometimes carried a gun.
• A police officer and an eye-witness testified about an incident during which Ruiz pulled his girlfriend out of her vehicle, beat and kicked her before throwing her to the ground, stole her vehicle, led police on a brief chase, then when caught, casually told his arresting officer that he could do whatever he wanted to his girlfriend.
• The prosecution presented numerous witnesses who testified regarding Ruiz's gang-related activities while in custody awaiting trial, including multiple incidents in which other inmates or jail guards were assaulted. Bexar County Adult Detention Center guards testified that Ruiz not only admitted to being in the Texas Syndicate prison gang, but he asked to be housed with other gang members.
Ruiz's trial counsel presented witnesses who testified that Ruiz was not violent, that he had a drug problem, and that he did not deserve to die. Ruiz's mother testified that he was a respectful son, that he expressed remorse for his crime and was a good person.
The federal district court concluded, however, that Ruiz's capital sentencing jury had before it "overwhelming evidence" showing Ruiz's (1) history and demonstrated propensity for extreme violence, even against those with whom he was close, (2) propensity for violence even while incarcerated, (3) abject refusal to accept any responsibility for his murder-for-hire, and (4) history of drug abuse.
A. Failure to Fully Investigate Ruiz's Claim of Long-Term Drug Abuse
Ruiz claimed before the federal district court that his trial counsel should have inquired further into his background to uncover potentially mitigating evidence in the form of his long history of drug abuse, which he claims was the cause of his violent behavior. The federal district court pointed out that Ruiz testified at trial that he abused alcohol, marijuana, LSD, and cocaine, but Ruiz offered no testimony at trial or at the habeas hearing establishing when he supposedly abused cocaine.
Dr. Harry Munsinger was the mental health expert who examined Ruiz on behalf of Ruiz's trial counsel. The federal district court found that Dr. Munsinger's conclusions in his report regarding Ruiz's drug abuse at the time of the offense were primarily based on information related to him by Ruiz. The federal district court stated that Dr. Munsinger did not offer any significant testimony regarding Ruiz's history of substance abuse beyond that contained in Ruiz's own trial testimony.
Dr. Seth Silverman examined Ruiz on behalf of Ruiz's federal habeas counsel. Dr. Silverman testified at Ruiz's federal habeas hearing. Dr. Silverman believed that Ruiz was abusing alcohol, marijuana, LSD, and cocaine at the time of the offense, that Ruiz's atypically aggressive behavior shortly before committing the offense was attributed to his cocaine addiction, and that Ruiz's post-arrest violent conduct could be attributed to Ruiz's de-toxing from cocaine. However, the federal district court found that Dr. Silverman's testimony at the habeas hearing regarding Ruiz's drug abuse merely repeated the same self-serving allegations Ruiz made during his own trial testimony, which the jury implicitly rejected. The federal district court noted that Dr. Silverman relied upon Ruiz's cousin, Mark Molina, to corroborate Ruiz's claims that Ruiz abused cocaine prior to fatally shooting Theresa Rodriguez. However, Molina gave no testimony at the habeas hearing suggesting that he ever had *816 any personal knowledge of Ruiz's alleged cocaine use.[43] Dr. Silverman admitted that even Molina was unable to confirm Ruiz's claims of consuming massive quantities of cocaine immediately prior to murdering Theresa Rodriguez. The federal district court found "serious credibility issues" with the factual information upon which Dr. Silverman based his opinions. And the federal district court found no credible evidence to support Ruiz's claim that he used cocaine.
The federal district court found that Dr. Silverman's conclusions regarding Ruiz's long-term cocaine use and cocaine addiction to be without sufficient evidentiary basis in the record.[44] The only evidence that Ruiz had abused cocaine prior to killing Theresa came from Ruiz's own testimony.
The conclusions in the report by Dr. Harry Munsinger, who examined Ruiz on behalf of Ruiz's trial counsel, and the hearsay testimony of Dr. Silverman, came exclusively from Ruiz.[45] As the federal district court pointed out, Dr. Silverman failed to address the substantial trial evidence that established Ruiz's violent behavior during pretrial detention in the months following Ruiz's arrest that was gang-related.[46]
Moreover, the federal district court found Ruiz's cousin's (Mark Molina's) testimony at the habeas hearing regarding Ruiz's drug abuse to be "wholly incredible."[47] It concluded that there was no credible evidence to establish that Ruiz used cocaine in the days leading up to his execution of Theresa Rodriguez.
The federal district court was unpersuaded that Ruiz's trial counsel was deficient for not investigating and developing the defensive theory that Ruiz had a long history of substance abuse:
This Court has disregarded a vast amount of rank hearsay testimony offered by [Ruiz's] federal habeas counsel during the evidentiary hearing herein because, under the retrospective lens of Strickland analysis, [Ruiz's] trial counsel cannot reasonably be faulted for failing to discover, develop, and present inadmissible hearsay testimony. [Ruiz's] family members, other than Molina, categorically denied any personal knowledge regarding [Ruiz's] alleged drug abuse when they testified before this Court. Insofar as those same family members furnished affidavits or gave Dr. Silverman interviews in which they furnished very different information concerning their knowledge of [Ruiz's] alleged drug abuse than the facts to which they testified under oath during the evidentiary hearing in this Court, this Court considers Dr. Silverman's conclusions to be unsupported and entitled to very little evidentiary weight.[48]
*817 The federal district court concluded that Ruiz's trial counsel was not ineffective for failing to investigate Ruiz's defense that he suffered from long-term drug abuse addiction.
B. Failure to Fully Investigate Ruiz's Claims That He Was Abused As A Child
Ruiz also claimed in his federal habeas petition that his trial counsel failed to conduct an adequate investigation into Ruiz's background for additional mitigating evidence establishing the very difficult circumstances of his childhood. The federal district court analyzed such claim as follows.
(1) The First Prong of the Strickland Test-Deficient Performance of Trial Counsel
In addition to rendering an opinion regarding Ruiz's drug abuse, Dr. Munsinger concluded in his report, in pertinent part, that (1) Ruiz's early family life was marked by frequent quarrels and physical fights between his parents, (2) Ruiz was likely to display erratic and unpredictable behavior and have trouble controlling his impulses, (3) Ruiz was deficient in social skills and uncomfortable being alone, (4) Ruiz may have difficulty differentiating between fantasy and reality, (5) Ruiz was experiencing significant depression and was prone to alcohol and drug abuse, (6) Ruiz was physically abused as a child, immature, and did not perform well in social situations, and (78) Ruiz was likely to experience periods of obsessive suicidal ideation. Dr. Munsinger testified at the federal habeas hearing that he was not interviewed or contacted by Ruiz's trial counsel after he submitted his written report. Ruiz also furnished to the federal district court several affidavits from friends and family purporting to establish that he was neglected and abused as a child.
In addition, Ruiz's mental health expert, Dr. Seth Silverman, testified at the habeas hearing that, based on interviews with Ruiz and Ruiz's family members, he believed Ruiz grew up in a "horribly abusive" family situation in which Ruiz was regularly beaten, abandoned, and starved.
However, during trial Ruiz testified that he came from a "good" family, and he chose to live with his grandmother and aunt. Ruiz and his mother both denied at trial that he was ever abused physically or mentally as a child. In defense of his performance, Ruiz's former trial counsel testified before the federal habeas court that Ruiz did not want his counsel to speak with any of his family members. His trial attorney also stated that he found "nothing mitigating" in Dr. Munsinger's report.
According to the federal district court, once Ruiz's trial counsel was furnished with Dr. Munsinger's report suggesting that Ruiz had experienced childhood abuse and that he "displayed clear indications of clinical depression, deficient social skills, and suicidal ideation," the failure of Ruiz's trial counsel to further investigate Ruiz's background beyond interviewing Ruiz and his mother "was anything but objectively reasonable."[49] The testimony before the federal district court established that Ruiz's trial counsel made no significant attempt to question any witnesses about their personal knowledge of Ruiz's childhood or family life, and the failure to do so after receiving Dr. Munsinger's report was objectively unreasonable.[50] The federal district *818 court concluded that Ruiz's trial counsel should not have accepted Ruiz's and his mother's denial of abuse at face value and should have done additional investigation into Ruiz's background.[51] Moreover, the federal district court found the trial counsel's conclusion that he found "nothing mitigating" in Dr. Munsinger's report to be "beyond merely incredible; it is inane."[52]
The federal district court concluded that "the conduct of [Ruiz's] trial counsel, in failing to undertake a more searching investigation into [Ruiz's] background (particularly with regard to allegations of physical abuse of [Ruiz] as a child), was objectively unreasonable."[53] The federal district court held that, as to this IAC claim, Ruiz satisfied the deficient performance prong of the Strickland test.[54]
(2) The Second Prong of The Strickland Test-Prejudice
As stated by the federal district court, "[i]n evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must reweigh all the evidence in aggravation against the totality of available mitigating evidence (had [Ruiz's] trial counsel chosen a different course)."[55] Strickland does not require the State to negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different.[56]
Although the federal district court found that Ruiz's trial counsel should have inquired further into Ruiz's background after having received Dr. Munsinger's report, Ruiz did not furnish any credible evidence to the federal district court suggesting that further pretrial interviews by his trial counsel would have produced any additional admissible mitigating evidence.
• There was no testimony of any physical abuse of Ruiz except hearsay testimony in which Ruiz's relatives repeated what Ruiz had told them as a child (i.e., that he had been beaten by his step-father, forced by his mother's boyfriend to face the wall or stay in the bathroom, or there was no food at his home. The court relayed much of the testimony in detail.)
• Ruiz's cousin, Mark Molina, was the only witness who testified at the habeas hearing that he observed one instance of physical abuse, when he and Ruiz were young and Ruiz's mother and aunt beat Ruiz because Molina had left a blanket lying on the floor. But there was no objective evidence that Ruiz sustained any injuries as a result of any beating or *819 other abuse allegedly inflicted upon him.
• The bulk of the abuse/neglect testimony presented to the federal district court through Ruiz's friends and family consisted almost exclusively of hearsay testimony given by witnesses in which they simply related statements made by Ruiz to them.
• There was testimony that Ruiz spent a lot of time with his other relatives, but there was no evidence that this was not voluntary on Ruiz's part.
• There was "a dearth" of testimony during the habeas hearing from persons having personal knowledge of the conditions inside the home in which Ruiz spent most of his formative years.
• Ruiz did not testify during this evidentiary habeas hearing.
• He did not call his mother to testify at the habeas hearing about conditions in their family's home.
• Ruiz failed to call his second step-father to testify at the habeas hearing despite Ruiz's federal habeas counsel's accusations that he had physically abused Ruiz.
• Although Dr. Silverman testified at the habeas hearing that he believed Ruiz had a "horribly abusive childhood," his conclusions came from Ruiz. Moreover, Silverman relied on Ruiz's aunt Rosa and other family members to corroborate Ruiz's claims he was starved, routinely beaten, and abused, but at the hearing those witnesses mostly denied any personal knowledge of such abuse.
Ruiz's trial counsel did not completely fail to present a case in mitigation. Trial counsel called Ruiz's mother (Maria Rangel), a female cousin (Laura Rodriguez), an uncle (David Ruiz), a female friend (Tracy Gaston), a former teacher and coach (Michael Lipscomb), and Ruiz's girlfriend (Roxanne Conway), all of whom testified during the punishment phase of the trial to Ruiz's non-violent nature and positive character traits.[57] However, any potentially beneficial aspects from Roxanne Conway's testimony were "more than offset" by her admissions on cross-examination that Ruiz had savagely beaten her, leaving her afraid of men (Ruiz in particular) and with injuries that required her to undergo multiple surgeries.[58]
Still, the only witness with personal knowledge who could have testified at trial about Ruiz having been physically abused was his cousin, Mark Molina. However, Molina confirmed before the federal district court at the habeas hearing that Ruiz had joined a street gang when he was seventeen. Thus, had Molina testified at trial, he would have potentially damaged Ruiz by controverting Ruiz's trial testimony denying any gang involvement.
Another witness testifying at the habeas hearing, Ruiz's aunt Griselda, also could have hurt Ruiz at trial more than helped him. The federal district court found that her testimony regarding Ruiz's childhood would not have afforded Ruiz significant benefit and might well have harmed him by contradicting Ruiz's denials that he had murdered Theresa Rodriguez for remuneration.[59]
*820 The federal district court did consider some new mitigating evidence. Ruiz's aunt Rosa testified at the habeas hearing that, when Ruiz was four or five years old, his mother attempted suicide and Ruiz was in their apartment during the attempt. She also testified that Ruiz's mother hit him a lot and made a second suicide attempt when Ruiz was fourteen or fifteen. However, said the federal district court, Ruiz's aunt Rosa did not testify that Ruiz had actually witnessed either of his mother's suicide attempts or that he personally observed the aftermath of either attempt. And, although she did testify that she once witnessed a step-father grab Ruiz too tightly, she denied ever seeing any bruises or injuries on Ruiz.
Another new witness whose testimony was considered by the federal district court was a former neighbor named Yolanda Mendoza. She testified at the habeas hearing that she saw Ruiz sleeping outside his aunt's residence on her porch when he was eight or nine years old. However, she offered no insight into the circumstances that led to Ruiz sleeping outside on his aunt's porch, and she had never seen Ruiz being physically abused or doing drugs.
The federal district court concluded that,
While [Ruiz] did present this Court with some additional, potentially mitigating evidence during the evidentiary hearing held November 2-3, 2010, that evidence fell substantially short of establishing that [Ruiz's] childhood was as "horrific" as that described by Dr. Silverman during his testimony before this Court. Contrary to [Ruiz's] assertions, there is no credible evidence before this Court establishing that [Ruiz] was routinely starved or physically abused as a child. Likewise, while there was testimony [Ruiz's] biological parents divorced when [Ruiz] was very young and [Ruiz] thereafter spent considerable portions of his youth living with relatives other than his mother, there is simply no credible evidence showing [Ruiz's] home life was as "horrific" as Dr. Silverman believed.
* * *
This Court is left with the fact [Ruiz] took the stand at his trial and (1) categorically denied he had suffered any abuse as a child, (2) insisted he chose to live with his aunts and grandparents, (3) categorically denied he had murdered Theresa Rodriguez for remuneration, (4) repeatedly denied he had executed any of his three written statements (attested to by numerous prosecution eyewitnesses who claimed to have witnessed [Ruiz's] execution of his written statements), (5) claimed to have come from a good family, and (6) instead, blamed his criminal offense on his history of long-term drug and alcohol abuse and his cocaine intoxication on the night of Theresa's murder. In contrast to [Ruiz's] lengthy and argumentative trial testimony, [Ruiz's] silence during the evidentiary hearing held before this Court was deafening.
Having spoken in such definitive terms during the guilt-innocence phase of his capital murder his [sic ] trial to deny he had suffered any abuse as a child, to prevail on his ineffective assistance claims herein, [Ruiz] owed this Court a rational explanation for the diametrically opposing accounts of his childhood he gave to his trial counsel and capital sentencing *821 jury, on the one hand, and to Dr. Munsinger and Dr. Silverman, on the other.
[Ruiz's] belligerent demeanor throughout his trial testimony effectively undermined any realistic hope [Ruiz's] trial counsel might have had to obtain a life sentence for [Ruiz] based upon a showing [Ruiz] had experienced such severe abuse and neglect as to warrant a reasonable juror's affirmative answer to the "mitigating evidence" Texas capital sentencing special issue.[60]
The federal district court noted that there was considerable evidence during the punishment phase of trial establishing Ruiz's demonstrated history of violent conduct, reputation for violence, and participation in violent gang-related activities during his pretrial detention. Despite Ruiz's repeated assertions that he was accepting responsibility for his crime, Ruiz "actually displayed the antithesis of sincere contrition and remorse for his crime throughout his trial testimony ."[61]
While acknowledging that Ruiz experienced a very disruptive childhood lacking stability and that his family was financially stressed, the federal district court found no credible evidence to support a finding that Ruiz experienced severe and extreme abuse as a child. The federal district court concluded that Ruiz failed to carry his burden of showing a reasonable probability that, but for his trial counsel's failure to more thoroughly investigate Ruiz's background, the outcome of the punishment phase of Ruiz's capital murder trial would have been different.
In light of the circumstances of [Ruiz's] offense and the other aggravating evidence then before [Ruiz's] capital sentencing jury, even if [Ruiz] had presented his capital sentencing jury with all of the new mitigating evidence [Ruiz's] federal habeas counsel presented to this Court, there is not even a remote possibility, much less a reasonable probability, the outcome of the punishment phase of [Ruiz's] capital murder trial would have been different.[62]
C. The Failure To Call Dr. Munsinger or Present His Report At Trial
Ruiz also complained before the federal district court that his trial counsel failed to introduce Dr. Munsinger's report into evidence or call him as a witness during the punishment phase. At the federal habeas hearing, Ruiz's trial counsel testified that any potential benefit that might have arisen from calling Dr. Munsinger to testify-with regard to Ruiz's allegedly diminished prospect for future violence-would have been more than offset by the fact that the prosecution had in its possession, and was prepared to play for the jury, a videotape of one of the jail riots in which Ruiz participated. In fact, it was undisputed at Ruiz's trial that he participated in at least three violent gang-related altercations while awaiting trial for capital murder.[63] The federal district court concluded that this was not an objectively unreasonable trial strategy.
"Weighing the advantages and disadvantages of calling a particular witness to testify is a matter usually left within the province of trial counsel's discretion."[64] The federal district court decided that there was nothing objectively unreasonable *822 with trial counsel's decision that Dr. Munsinger's testimony would be of little help in obtaining a jury verdict favorable to Ruiz on the "future dangerousness" special issue. His trial counsel reasonably concluded, said the federal district court, that Ruiz's "participation in the riot at the jail and other violent altercations while awaiting trial in this case 'blew away' Dr. Munsinger's speculative prognostication that [Ruiz] would be non-violent if incarcerated."[65]
In addition, said the federal district court, while Dr. Munsinger did state in his report that he believed Ruiz had been abused as a child, his report was "replete with references" to Ruiz's antisocial tendencies.[66] Moreover, although Dr. Munsinger did agree that Ruiz "probably committed the alleged offense while suffering from significantly reduced mental capacity resulting from voluntary use of drugs or other intoxicants," the federal district court concluded that, "in the context of a capital sentencing proceeding, evidence of voluntary intoxication is at best a double-edged sword."[67] Thus, the federal district court concluded that Ruiz's trial counsel was not deficient for failing to call Dr. Munsinger as a witness before, or present his report as evidence to, the capital sentencing jury.
In view of the unchallenged evidence before [Ruiz's] capital sentencing jury (and now before this Court) establishing [Ruiz] voluntarily self-medicated himself in the days preceding the murder, and the potentially detrimental aspects of Dr. Munsinger's conclusions regarding [Ruiz's] antisocial tendencies, this Court finds it was objectively reasonable for [Ruiz's] trial counsel not to present Dr. Munsinger's opinions and conclusions, as contained in his written report, to [Ruiz's] capital sentencing jury. The potential beneficial aspects of Dr. Munsinger's conclusions (i.e., those addressing [Ruiz's] acute intoxication (on an unspecified substance) at the time of [Ruiz's] capital offense, were already before the jury by virtue of [Ruiz's] guilt-innocence phase trial testimony. Moreover, Dr. Munsinger's conclusions in that regard were based exclusively upon [Ruiz's] representations and highly speculative in nature. Dr. Munsinger admitted as much during his testimony before this Court when he testified he made no effort to secure information concerning the circumstances of [Ruiz's] offense from any third-party and he made a conscious decision not to discuss the circumstances of [Ruiz's] offense with [Ruiz] .... It was objectively reasonable for [Ruiz's] trial counsel to conclude calling Dr. Munsinger to testify at the punishment phase of [Ruiz's] trial (in the same manner set forth in Dr. Munsinger's report) posed more potential pitfalls than potential benefit.[68]
The federal district court also concluded that the second prong of Strickland was not met. The new mitigating evidence did not establish a reasonable probability that, but for the failure of Ruiz's trial counsel to either introduce Dr. Munsinger's report or call Dr. Munsinger to testify at the punishment phase of Ruiz's capital murder trial, the outcome of that phase of the trial would have been different.
D. The Failure To Further Investigate Ruiz's Mental Health
Another claim raised by Ruiz in his federal habeas petition was that his trial *823 counsel should have retained the services of a mental health professional who could have rendered an opinion on the impact of Ruiz's alleged cocaine addition on his conduct at the time of the offense. As noted above, the federal district court decided that Ruiz's trial counsel's failure to investigate further into Ruiz's mental health after receiving Dr. Munsinger's report was objectively unreasonable. However, the federal district court also decided that the outcome would not have changed even if his trial counsel had done further investigation. For the same reasons, the federal district court concluded that Ruiz's counsel was not ineffective for failing to further investigate into Ruiz's mental health because Ruiz's complaint did not satisfy the prejudice prong of Strickland .
Paraphrasing the federal district court's conclusions, when viewed in the context of (1) the truly callous, cold-blooded, nature of Ruiz's offense, (2) the modest sum he was willing to accept for taking a human life, (3) Ruiz's involvement in at least three violent, gang-related assaults on jail guards and other inmates while he was awaiting trial for this capital murder, (4) Ruiz's refusal to demonstrate sincere remorse or accept responsibility for his offense, (5) Ruiz's participation in a conspiracy to smuggle marijuana into the Bexar County Adult Detention Center during his pretrial detention, and (6) Ruiz's history of extreme violence toward others with whom he had a close relationship (Roxanne Conway), the limited new mitigating evidence does not establish a reasonable probability that, but for the failure of his trial counsel to more thoroughly investigate his background, the outcome of the punishment phase would have been different.
THE FIFTH CIRCUIT'S ANALYSIS OF RUIZ'S IAC CLAIMS [69]
Ruiz appealed the federal district court's decision denying his federal habeas IAC claims to the Fifth Circuit. Ruiz argued that the federal district court erred in rejecting his new evidence. The Fifth Circuit agreed with the federal district court that the new habeas evidence supporting Ruiz's claims of ineffective assistance of trial counsel would not have changed the outcome of the sentencing. The Fifth Circuit denied Ruiz's motion for a certificate of appealability.
The Fifth Circuit began its analysis by setting forth the standard for reviewing ineffective assistance of counsel claims:
To prove that his sentence requires reversal under Wiggins , Ruiz must show that his trial counsel's failure to investigate and present mitigating evidence prejudiced the defense. To show prejudice, Ruiz must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the sentencing proceeding would have been different. In determining whether Ruiz has made this showing, we compare the evidence actually presented at sentencing with any additional mitigating evidence presented in the habeas proceeding. Specifically, we ask whether under the applicable state capital sentencing statute, the additional mitigating evidence is so compelling that there is a reasonable probability that at least one juror could have determined that because of the defendant's reduced culpability, death is not an appropriate sentence. We agree with Ruiz that in assessing prejudice, we need not make the state-law evidentiary findings that would have been at issue at sentencing. Consequently, we conduct our analysis *824 by evaluating the totality of the evidence-both that adduced at trial, and the evidence adduced in the habeas proceedings.[70]
The Fifth Circuit set out the details of the testimony and evidence produced at the federal habeas evidentiary hearing. "Having examined the totality of the record," the Fifth Circuit made "a threshold inquiry into the likelihood that Ruiz's sentencing outcome would have been different in light of the new mitigating evidence."[71] The Fifth Circuit noted that, under Texas Code of Criminal Procedure, Article 37.071, Ruiz's sentencing jury could only impose a death sentence only if it unanimously answered the mitigation issue set forth in Section 2(e) in the negative. Section 2(e) required Ruiz's sentencing jurors to determine whether "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."[72]
The Fifth Circuit concluded that, although "[t]he new evidence paint[ed] a bleak picture of Ruiz's childhood,"[73] the new evidence would not have changed the sentencing outcome:
In this case, the evidence bearing on Ruiz's character and the nature of his crime was unlikely to induce his jurors to vote for leniency. Ruiz shot Theresa Rodriguez in cold blood for a relatively small sum of cash, which he spent on clothes and partying. While awaiting trial, Ruiz joined the violent Texas Syndicate prison gang and participated in at least three vicious attacks on prison guards and inmates, all within the span of less than a year. At trial, Ruiz showed no sincere remorse for killing Ms. Rodriguez, retracting virtually every admission he had made in his post-arrest confessions. Ruiz's own character witness, Roxanne Conway, conceded that Ruiz had beaten her so severely that she feared for her life and had to undergo multiple surgeries.
Against this evidence of Ruiz's brutal crime and violent and remorseless character, Ruiz's sentencing jury would have had to weigh the mitigating value of the new habeas evidence bearing on Ruiz's childhood and adolescence. This evidence suggests that Ruiz endured hardship and deprivation at the hands of a self-absorbed mother and an abusive stepfather. However, it also indicates that Ruiz could rely on his extended family-especially his aunt Rosa and uncle David-for shelter, care, and affection. Ruiz's new evidence bears scant resemblance to that adduced in Wiggins and Williams v. Taylor [529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ], cases in which the Supreme Court found prejudice. ... After a threshold inquiry into the record, we believe there is virtually no chance-let alone a "reasonable probability"-that Ruiz's new habeas evidence would have affected the sentencing outcome.[74]
Ruiz appealed the Fifth Circuit's decision to the United States Supreme Court. The *825 Supreme Court denied certiorari on May 19, 2014.[75]
RUIZ'S THIRD STATE WRIT APPLICATION (WR-27,328-04)
On August 12, 2016, Ruiz filed his third state application for writ of habeas corpus under Article 11.071. In this subsequent writ application, Ruiz asserts as follows:
1. His trial counsel performed deficiently by failing to investigate and present mitigating evidence at the punishment phase of trial;
2. His initial habeas counsel performed deficiently by not raising this issue in Ruiz's initial writ application; and
3. Executing Ruiz over two decades after his conviction violates the Eighth Amendment to the United States Constitution.
By order dated August 26, 2016, this Court stayed Ruiz's execution date that had been scheduled for August 31, 2016.
A. Ruiz Has Already Received A Final Merits Determination of His IAC Claims
Ruiz again claims his trial attorneys did not investigate mitigating evidence that might have resulted in a life sentence, such as his childhood "marred by poverty, abandonment, abuse, and trauma." He asserts that such deficient performance serves as a basis for collateral relief from his death sentence pursuant to Wiggins v. Smith .[76] Ruiz claims that because his first habeas counsel failed to assert a Wiggins claim, he has never received a final merits determination from any court-state or federal. That could not be further from the truth.
Ruiz's ineffective assistance claims have been fully and completely vetted in the federal court system over a period of roughly seven years. He has been provided with highly competent federal habeas attorneys, he has been afforded a full and fair evidentiary hearing in federal district court, and his claims of ineffective assistance of trial counsel have been inspected, scrutinized, studied, probed, analyzed, reviewed, and evaluated by the three main levels of the federal court system-the District Court for the Western District of Texas, the Fifth Circuit, and the United States Supreme Court (which has denied certiorari review of Ruiz's claims). There is nothing more this Court could or would do differently.
B. Overturning Graves Would Not Help Ruiz
Ruiz also asks this Court to reexamine its holding in Ex parte Graves .[77] In Graves , this Court held that a writ applicant is not entitled to effective assistance of habeas counsel.[78] If an applicant's habeas counsel fails to raise a potentially meritorious IAC claim in an initial writ application, under our holding in Graves , that claim cannot be revived in a subsequent writ application by asserting ineffective assistance of habeas counsel. Ruiz believes *826 that overturning Graves would pave the way for granting him relief. It would not.
In 2007, when presented with Ruiz's second state writ application claiming that his habeas counsel on his first writ was ineffective, the plurality opinion dismissing Ruiz's subsequent writ did not mention Graves -even though Ruiz had asserted ineffective assistance of habeas counsel, and even though Ruiz's state habeas counsel had been described by the federal district court as "appallingly inept" and "wholly incompetent."[79] Curiously, neither Judge Womack nor Judge Holcomb mentioned Graves in their statements accompanying this Court's order dismissing Ruiz's writ application. When first presented with the opportunity, under these facts, this Court had good cause at that time to reexamine its holding in Graves . But now, this case does not present a reason to reconsider Graves . That ship has sailed.
First, this Court already reached the merits of Ruiz's claim of ineffective assistance of counsel, so says the Fifth Circuit's 2007 opinion.[80] The Fifth Circuit's conclusion that Ruiz exhausted his IAC claims in state court was, at that time, a necessary requirement to allow Ruiz to present those claims in federal district court-which he has already done.[81] That decision by the Fifth Circuit makes our consideration of Graves under these facts a moot issue.
Second, as noted above, the merits of Ruiz's IAC claims have already been thoroughly addressed by two federal courts. There is no doubt that proper consideration has been given to Ruiz's IAC claims. So, overturning Graves would not change the fact that Ruiz's IAC claims have already been resolved.
Third, the doctrine of res judicata would seem to preclude this Court from evaluating Ruiz's IAC claims.[82] Ruiz has raised his IAC claim under Wiggins ; it is a federal claim that has already been resolved by the federal courts. While a federal district court may hold a fact-finding hearing on federal constitutional issues, notwithstanding the prior resolution of the *827 issues in state court,[83] it does not make sense for this Court to order a fact-finding hearing on federal constitutional issues, notwithstanding the prior resolution of those issues in federal court .
Therefore, while the consequences resulting from the poor performance of Ruiz's habeas counsel-as seen by the extreme lengths the Fifth Circuit was willing to go to in order to circumvent the procedural bar-may highlight the need to revisit our holding in Graves , the time to reconsider Graves under the facts of this case has passed.
C. Ruiz's Lackey Claim Is Without Merit
Ruiz also asserts a Lackey claim-a constitutional challenge against carrying out of a death sentence on the grounds that years on death row make the ultimate punishment cruel and unusual in violation of the Eighth Amendment.[84] This Court has previously addressed and rejected this claim.[85] Ruiz has availed himself of not only the state system of appellate procedure, but he has also extensively pursued relief under the federal system. As we noted in Smith v. State , "[t]he present standards of decency do not deem cruel and unusual the delay occasioned while a condemned prisoner pursues direct appeals and collateral relief."[86] Ruiz has not supplied any new evidence or law that persuades this Court to hold otherwise.
For the foregoing reasons, we (1) dismiss Ruiz's current writ application under Article 11.071, § 5, (2) deny his motion to reconsider his prior writ application, and (3) deny his motion to further stay his execution.
Johnson, J. filed a concurring opinion. Alcala, J., filed a dissenting opinion. Hervey and Yeary, JJ. not participating.
CONCURRING OPINION
Johnson, J., filed a concurring opinion.
I am persuaded by the Court's opinion that applicant's claims are properly denied by this Court. I am also persuaded that we should revisit Ex parte Graves , 70 S.W.3d 103 (Tex. Crim. App. 2002), but, because applicant has had a full and fair hearing in the federal courts, not in this case.
The Sixth Amendment states that "the accused shall ... have the assistance of counsel for his defence." We have held numerous times that trial counsel must be competent and provide effective assistance, and we have, in many cases, granted habeas corpus relief when the record supports a finding of ineffective assistance. See, e.g. , Ex parte Bryant , 448 S.W.3d 29 (Tex. Crim. App. 2014) ; Ex parte Overton , 444 S.W.3d 632 (Tex. Crim. App. 2014) ; Ex parte Amezquita , 223 S.W.3d 363 (Tex. Crim. App. 2006) ; Ex parte Varelas , 45 S.W.3d 627 (2001). The United States Constitution does not state that counsel under the Sixth Amendment must be competent and provide effective assistance, yet for many decades, courts across this nation have read that requirement into the Sixth Amendment. Why, then, is that same requirement *828 not applied to counsel on writs of habeas corpus?
An accused is entitled to file a writ of habeas corpus. United States Constitution, Article I, section 9 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). Under this Court's case law, such a writ is, in general, the proper avenue to raise claims of ineffective assistance of trial counsel. Andrews v. State , 159 S.W.3d 98, 102 (Tex. Crim. App. 2005) ; Freeman v. State , 125 S.W.3d 505, 506 (Tex. Crim. App. 2003) ; Thompson v. State , 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999) ; Jackson v. State , 973 S.W.2d 954, 957 (Tex. Crim. App. 1998). For most applicants, such a writ will be the only avenue by which to seek relief on a claim of ineffective assistance. I believe that the Sixth Amendment right to "have the assistance of counsel for his defence" should be read to include the right to competent writ counsel for "his defence" of rights that are alleged to have been denied at trial.
The legislature has determined that an applicant must state all available claims in the first writ. An egregiously deficient first writ deprives an applicant of the one full and fair hearing that the legislature envisioned. Yet in general, even if trial counsel was "appallingly inept" and "egregiously deficient,"[1] a convicted person is not entitled to counsel on an application for a writ, and even if writ counsel is retained or appointed, that counsel does not have to be competent in that area of law or to provide effective assistance. Ineffective assistance at trial or on appeal is bad enough, but to turn a blind eye to inept or deficient representation by writ counsel is to, de facto , abrogate Article I, section 9, of the United States Constitution.
DISSENTING OPINION
Alcala, J., filed a dissenting opinion.
Because this Court's majority opinion does through the back door what it should be considering from the front door, I respectfully dissent. Today, this Court's majority opinion dismisses this application filed by Rolando Ruiz, applicant, on the procedural basis that it is a subsequent habeas application. Despite its length, this Court's majority opinion is not an actual analysis of the substantive merits of applicant's arguments, but it is instead an explanation for its decision to place a barrier to prevent this application from even entering the front door of the courthouse for consideration of its merits. Oddly, this Court's majority opinion appears to substantively analyze the merits of applicant's arguments to explain why this Court will not permit applicant through the front door when instead it would be more appropriate to let this applicant into the courthouse through the front door and consider his arguments on the merits after he has been permitted entry. This Court's rationale for dismissing this application on this procedural basis appears to be that the applicant's arguments were considered and rejected by a federal district court judge. But I cannot agree with this Court's majority opinion that the judgment of a single federal district court judge should replace the judgment of the state trial-court judge who sentenced applicant to death or of this Court that is the entity ultimately responsible for state habeas litigation of death-penalty cases under the Texas Constitution. Because no state court has ever addressed the actual merits of applicant's complaints, I would file and set this case so that the state trial-court judge who sentenced applicant to death and this *829 Court may fully address the substantive legal questions raised by this application. I, therefore, respectfully dissent from this Court's judgment that dismisses this habeas application, declines to reopen applicant's previous application, and lifts the stay of applicant's execution.
I. Analysis
Applicant has presented compelling issues in the instant pleadings that have never been addressed in state court, and I would accordingly file and set this case to decide those matters. In this case, although I recognize that a substantial amount of federal habeas litigation was conducted, I cannot agree that the federal proceedings are an adequate substitute for the state proceedings that should have been conducted to address the merits of these complaints in the first instance. Furthermore, I would file and set this case to examine the merits of applicant's complaints that his lengthy solitary confinement is cruel and unusual punishment.
A. This Court Has Never Decided the Substantive Merits of Applicant's Complaint
Today, rather than decide the substantive merits of applicant's complaint, this Court's majority opinion dismisses it on procedural grounds, and it then attempts to justify that dismissal by discussing the equity of the situation through an explanation that the essence of applicant's claim has been reviewed by the federal courts. I disagree with this Court's majority opinion's analysis because its dismissal disallows applicant from mere entry into the courthouse by substantively analyzing the merits of his complaints as if he had been permitted entry, and then using that analysis to justify this Court's refusal to permit his mere entry.
Applicant contends that he is "entitled to further review and relief on his Wiggins [v. Smith ] claim that, under the Sixth and Fourteenth Amendments, trial counsel unreasonably narrowed the sentencing-phase investigation." See Wiggins v. Smith , 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (holding that attorney's failure to adequately investigate capital defendant's background and present mitigating evidence at punishment phase constituted ineffective assistance in violation of the Sixth Amendment). Specifically, applicant contends that his trial counsel were ineffective for failing to investigate and present evidence of his troubled childhood that was plagued by abuse and neglect, which, he contends, might have persuaded the jury to sentence him to life rather than death had it been discovered and admitted at his trial. Applicant asserts that his evidence shows that his childhood and adolescence were "marred by some of the most profound hardship imaginable" and that this evidence was never heard by the jury that sentenced him to death. Applicant contends that the "jury never heard that [applicant] twice saw his mother try to kill herself, that he was forced to stay in the room while his mother [who was a prostitute] had sex with clients, that his school records reflect nineteen different home addresses, that he grew up without a father, that he was repeatedly abandoned by his mother, that he grew up watching men beat women, that he was himself subject to repeated physical abuse and malnourishment, that his second stepfather was a gang lord, and that his family constantly exposed him to the drugs and alcohol upon which he eventually became dependent."
Applicant acknowledges that this Court has previously held that his Wiggins claim is procedurally barred due to his failure to raise it in his initial habeas proceeding. Nevertheless, applicant urges this Court to excuse his procedural default and adjudicate his claim on the merits, given that this *830 claim was forfeited as a result of incompetence by his appointed counsel in that prior proceeding. I note that the parties appear to agree that this Court has never conducted a full review of applicant's Wiggins claim on the merits. The underlying issue presently before this Court is whether, even though state courts have not adjudicated applicant's Wiggins claim on the merits, any equitable concerns in that regard may be alleviated by the fact that this claim was heard and resolved by federal courts. The parties strenuously disagree about whether federal courts have ever fully and fairly considered the merits of applicant's claim. As to this matter, I agree in part with each of the parties.
I agree with the State that the federal district court conducted a de novo review of most of the evidence presented in the instant habeas application with respect to the merits of applicant's Wiggins claim. The federal district court specifically observed that it was conducting a "de novo review" of applicant's claims asserting ineffective assistance of counsel without any deference to the state courts, which it concluded had never addressed the substance of applicant's complaints. Ruiz v. Thaler , 783 F.Supp.2d 905, 913 (W.D. Tex. 2011). Unpersuaded by many of the assertions that had been pleaded by applicant, the federal district court ultimately held against applicant on his ineffective-assistance claims by determining that applicant was not prejudiced by his trial attorney's deficient performance. Id. at 940-47. The federal district court also denied a certificate of appealability.
Although I agree with the State that the federal district court conducted a de novo review of the evidence and legal arguments relevant to applicant's Wiggins claim, it should be noted that the reason that this federal hearing had to occur at all is because this Court had abdicated its responsibility to permit a substantive habeas review of applicant's claim. Had it employed proper procedures, this Court should have decided that initial state habeas counsel was ineffective for failing to provide evidence about applicant's Wiggins claim, and this Court should have permitted that litigation on the merits in state court. Had that occurred, then the federal district court would not have had to conduct a de novo review of applicant's Wiggins claim. It appears that the only reason that the federal district court had the evidentiary hearing of applicant's Wiggins claim is because this Court had refused to permit litigation on that claim on procedural grounds. Again, even today, there is no actual substantive consideration of applicant's claims and instead this Court repeats what it did before, albeit with more discussion: Today, it again dismisses applicant's habeas application on procedural grounds.
As I have explained above, I agree in part with the State, but I also agree in part with applicant that the federal appellate court's review was tilted in favor of the State due (1) to the standard of review that defers to a state court's resolution of a state matter, and (2) to the fact that the federal appellate court was reviewing only whether the federal district court had properly denied a certificate of appealability. Applicant, therefore, appears to be correct that the Fifth Circuit Court of Appeals did not neutrally review the federal district court's substantive assessment of his Wiggins claim. See Ruiz v. Stephens , 728 F.3d 416, 429 (5th Cir. 2013).
The Fifth Circuit weighed its review in favor of the State due to its deferential standard of review. As to this matter, applicant argues that "the Fifth Circuit imposed the federal relitigation bar, incorrectly treating the [Court of Criminal Appeals's] 2007 order [rejecting his claim *831 as procedurally barred] as a disposition on the merits of the Wiggins claim." In footnote six of his application, applicant further explains that " 28 U.S.C. 2254(d) bars merits consideration of any claim decided on the merits in state court, unless the inmate can show that the state court's assessment of the merits was 'unreasonable.' " See 28 U.S.C. § 2254(d)(1)-(2). He asserts that, to be " 'unreasonable,' the state court's merits determination must be so lacking in support that no 'fair-minded jurist' could deny the claim." Thus, applicant argues that, although it may appear as if the federal appellate court neutrally reviewed the federal district court's analysis of his mitigation argument, in fact the federal appellate court's evaluation of his arguments was colored by the deferential standard of review under which the federal courts operated. In short, the federal courts, he suggests, have never decided the merits of his argument on a clean slate. Applicant's contention here is supported by the Fifth Circuit's explanation of the applicable law, which it described as being highly deferential to this Court's summary denial of relief. See Ruiz , 728 F.3d at 424 (explaining that the question presented by applicant's request for a certificate of appealability was "whether it [was] debatable that [this Court's] order was 'contrary to, or involved an unreasonable application of clearly established Federal law"; under this standard, "even a strong case for relief does not mean that a state court's contrary conclusion was unreasonable"). Therefore, even though the district court conducted a de novo review of applicant's claims, it appears that, in affirming the denial of the certificate of appealability, the Fifth Circuit applied a standard of review that was deferential to this Court's resolution of applicant's habeas claim against him. That deference to this Court may have colored the federal appellate court's analysis of the federal district court's decision. I note here that, although the Fifth Circuit treated this Court's dismissal of applicant's Wiggins claim as being a disposition on the merits, this Court had in fact rejected applicant's claim by applying the procedural bar on subsequent writs, and to this day this Court has never addressed the substantive arguments or evidence on the merits. Even accepting that applicant's claim received a de novo review by the federal district court that heard most of the evidence he presents in his instant habeas application, it appears that he has never had a neutral appellate review of the federal district court's decision. Thus, this Court should file and set this matter to ensure that applicant's extensive habeas evidence in support of his Wiggins claim is decided on the merits by this Court rather than rejected on the basis of a procedural bar.
B. This Court Should Overrule Graves and Resolve Cases Like This One On Its Merits
It is undisputed that applicant's claim was forfeited due to the failure of his initial habeas counsel to raise it in the initial habeas proceeding. In the past, I have expressed my view that, when a death-sentenced individual can show that he received incompetent representation during the initial state habeas proceeding, and when that incompetent representation has resulted in the forfeiture of one or more substantial claims for relief, then the applicant is entitled to merits review of those claims. See Ex parte Buck , 418 S.W.3d 98, 99 (Tex. Crim. App. 2013) (Alcala, J., dissenting) (suggesting that, "when an applicant can demonstrate that initial habeas counsel's performance fell below the minimum standards for representation set forth in Article 11.071, and when an applicant can demonstrate that, *832 as a result of counsel's incompetence, a substantial claim for relief was forfeited, this Court may properly exercise its habeas jurisdiction to consider the merits of the underlying claim"). In Buck , I based my view on the statutory language in Article 11.071 that guarantees capital habeas applicants representation by "competent" appointed counsel and that requires such counsel to "investigate expeditiously" all possible grounds for relief. See ids="7253149" index="25" url="https://cite.case.law/sw3d/418/98/#p99">id. at 106-07 (citing TEX. CODE CRIM. PROC. art. 11.071, §§ 2(a), 3(a) ). I opined that, in situations in which these statutory requirements had not been met by appointed habeas counsel, this Court should hold that the initial application was improperly filed and decline to apply the procedural bar in Article 11.071, Section 5. Id. at 107. In the absence of such an approach, I observed that, as a result of incompetent representation in the initial habeas proceeding, capital habeas applicants may be unjustly denied merits review of their substantial claims for relief in any court. Id. at 105-06 (observing that, when initial habeas counsel fails to raise a substantial claim, the applicant will likely be "prevented, through an array of state and federal procedural-default rules and bars on successive writs, from receiving a merits adjudication of any legitimate claims for relief"). I noted that such an outcome would be "inconsistent with both the capital habeas statute's plain terms and this Court's previous statements regarding its underlying purpose" of affording death-row inmates a full and fair opportunity to litigate their post-conviction claims. Id. at 106.[1]
Here, it is plainly apparent that the representation by applicant's initial habeas counsel was woefully inadequate. Not only did applicant's appointed habeas counsel fail to properly raise applicant's Wiggins claim-he failed to raise any ineffective-assistance claims at all, and instead appears to have asserted only record-based claims that would have required no factual development and, under this Court's longstanding precedent, were barred on habeas because they could have been litigated on direct appeal. The poor performance by habeas counsel in the initial 11.071 proceeding was noted by the federal district court, which stated that "the quality of representation petitioner received during his state habeas corpus proceeding was appallingly inept."
*833 Ruiz v. Dretke , No. Civ. SA-03-CA-303-OG, 2005 WL 2620193, at *2 (W.D. Tex. Oct. 13, 2005) (observing that "[p]etitioner's state habeas counsel made no apparent effort to investigate and present a host of potentially meritorious and readily available claims for state habeas relief," and describing the initial state habeas application as "frivolous"). For the same reasons as those I expressed in Buck , I would hold that applicant is statutorily entitled to something more than "appallingly inept" representation by his appointed counsel in the initial 11.071 proceeding. In my view, under these circumstances, in which the performance by initial habeas counsel was apparently so poor as to render the initial habeas application a nullity, applicant is entitled to review of his substantial Wiggins claim on the merits. This Court should take this opportunity to revisit its precedent barring such an approach, Ex parte Graves , and this is particularly true given that this precedent is nearly fifteen years old. See Ex parte Graves , 70 S.W.3d 103, 117 (Tex. Crim. App. 2002) (holding that Article 11.071"grants a statutory right to the appointment of competent counsel, but it does not give a habeas applicant a constitutional or statutory right to effective assistance of that counsel in the particular case that can form the basis of a subsequent writ"). As I explained in Buck , in the intervening period since Graves was decided, the Supreme Court has suggested that equity and fairness require that substantial ineffective-assistance claims forfeited as a result of ineffectiveness by habeas counsel in the initial state habeas proceeding be adjudicated on the merits without regard to ordinary procedural-default principles. See Martinez v. Ryan , --- U.S. ----, 132 S.Ct. 1309, 1318, 182 L.Ed.2d 272 (2012) (explaining that, "as an equitable matter, [ ] the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim," and creating exception to ordinary procedural-default rules in light of that equitable consideration); Trevino v. Thaler , --- U.S. ----, 133 S.Ct. 1911, 1921, 185 L.Ed.2d 1044 (2013) (applying equitable rule of Martinez in context of Texas capital-murder case, and explaining that, in the absence of such a rule, "the Texas procedural system would create significant unfairness"). And, although I recognize that the holdings of those cases are directly applicable only in federal court, the reasoning underlying those decisions applies with equal force to state habeas proceedings, and thus those cases provide an additional justification for this Court to revisit its holding in Graves . Given the incompetent performance by initial state habeas counsel in this case, and because counsel's incompetence has resulted in the forfeiture of a substantial claim for relief, I would hold that applicant is entitled to merits review of that claim in this Court, both as a matter of his statutory entitlement to competent counsel under Article 11.071 and in the interests of equity and fairness.[2]
*834 This case is much like many of the other cases that have recently been stayed by this Court. There are problems in this case that give me great pause, such as the facts that (1) applicant's trial attorney did not adequately investigate for mitigation evidence, nor did he adequately present the mitigation evidence of which he was aware, which is contrary to today's standards for attorneys in capital-murder trials, (2) applicant's trial attorney was the same attorney who represented applicant on appeal, which is contrary to today's standards for attorneys in capital-murder trials, and (3) applicant's state habeas counsel failed to present any arguments that could reasonably lead to relief from this conviction, such as the instant claims about the failure to investigate and present mitigation evidence, which is contrary to today's standards for attorneys in capital post-conviction proceedings. That the procedures that were then employed are certainly unacceptable today is problematic, to say the least.
Here, no one appears to dispute that the state criminal-justice system has failed to review the substantive merits of applicant's complaint that trial counsel was ineffective in the punishment phase of his trial. Although the federal district court conducted a de novo review and determined that applicant had not proven his claim that trial counsel was ineffective, the federal appellate court reviewed that decision under a deferential standard that would favor the State in this case. Thus, I conclude that the federal appellate review of applicant's Wiggins claim cannot be fairly characterized as an adequate substitute for the absence of state court review of that claim on its merits. Given all of these considerations, I would file and set this habeas application and address the substantive merits of applicant's complaints about whether his trial attorney was ineffective in the punishment phase of trial.
C. This Court Should Address Whether Solitary Confinement As a Result of a Death Sentence Constitutes Cruel and Unusual Punishment
Applicant argues that the length of his sentence in solitary confinement on death row violates the federal Constitution's guarantee against cruel and unusual punishment. Noting that he has been in solitary confinement for most of over two decades, applicant contends that carrying out his death sentence after such a lengthy delay would violate the constitutional prohibition against cruel and unusual punishment in light of evolving standards of decency. Applicant cites to Justice Breyer's recent dissent in Glossip v. Gross , which states that "the circumstances and the evidence of the death penalty's application have changed radically" so as to warrant a reexamination of whether the penalty remains constitutionally permissible in light of prevailing social norms. See Glossip v. Gross , --- U.S. ----, 135 S.Ct. 2726, 2755, 192 L.Ed.2d 761 (2015) (Breyer, J., dissenting). Of particular relevance to his case, applicant cites Justice Breyer's statements addressing the "excessively long periods of time that individuals typically spend on death row, alive but under a sentence of death." Id. at 2764. In keeping with the views I expressed in my recent opinion in Ex parte Murphy , I would additionally permit applicant the opportunity to litigate this claim on the merits. See *835 Ex parte Murphy , 495 S.W.3d 282, 290 (Tex. Crim. App. 2016) (Alcala, J., concurring and dissenting) (urging Court to consider whether capital murderer's "decades-long confinement in a small individual cell with little human contact" constituted cruel and unusual punishment under the facts of that case). Given that applicant's over two-decade-long confinement had not occurred when he last filed a post-conviction habeas application, he cannot be faulted for not having raised this complaint earlier.
I acknowledge that there appears to be a strong argument that complaints about prison conditions should be considered separately from the constitutionality of a death sentence. But rather than dismiss applicant's complaint on the grounds that it is procedurally barred, I would file and set his case for resolution of this complaint on the merits.
II. Conclusion
The Court today dismisses applicant's claims by applying the bar on subsequent writs and by declining to reconsider its prior resolution of his ineffective-assistance claim. For all of the foregoing reasons, I would not dismiss this application but would instead file and set this case in order to give full consideration on the merits to these claims. With these comments, I respectfully dissent.

See Ruiz v. Dretke , No. SA-03-CA-303-OG, 2005 WL 2146119, at *3 (W.D. Tex. Aug. 29, 2005) ("Taking the stand against his trial counsel's advice, [Ruiz] testified in pertinent part that ... he had no motive for killing Theresa but had done so simply because he was drunk. ..."); see also Ruiz v. Stephens , 728 F.3d 416, 419 (5th Cir. 2013) ("Though Ruiz admitted that he killed Theresa, he claimed that he had done so unintentionally after ingesting a large quantity of narcotics."). The federal district court noted in one of its opinions issued in this case that the state trial court held a brief hearing outside the jury's presence during which Ruiz acknowledged that he wanted and planned to testify despite his counsel's wishes and against his counsel's advice. Ruiz v. Dretke , 2005 WL 2146119, at *3, nn.16-17 (citing S.F. Trial, Volume 33, at pp. 336-38, and 340-490).

Ruiz v. State , No. AP-72,072 (Tex. Crim. App. Feb. 25, 1998) (not designated for publication).

"Now housed at the Polunsky state prison unit near Livingston, Ruiz does not contest that he was paid $2,000 by brothers Michael and Mark Rodriguez to kill the victim, who was Michael Rodriguez's wife, so the siblings could collect $400,000 in insurance." Bruce Selcraig, Texas Appellate Court Issues a Stay of Execution for San Antonio Hit Man , San Antonio Express News , Aug. 28, 2016, at A3. His current appellate counsel is quoted as saying, Ruiz "knows what he did was an unspeakable crime." Id.

Tex. Code Crim. Proc. art. 11.071 § 5.

Ex parte Ruiz , No. WR-27,328-02 (Tex. Crim. App. Apr. 2, 2003) (not designated for publication).

Ruiz's federal habeas counsel alleged what is known as a Wiggins claim. In Wiggins v. Smith , 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), it was alleged that trial counsel was ineffective under the standards established in Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) because he failed to adequately investigate and present mitigating evidence during Wiggins's punishment phase of his capital murder trial. The Supreme Court held that the performance of Wiggins's attorneys violated his Sixth Amendment right to effective assistance of counsel because they failed to conduct a reasonable investigation of potentially mitigating evidence, and such failure prejudiced Wiggins's defense because such evidence, taken as a whole, might have influenced the jury's appraisal of his moral culpability. 539 U.S. at 513, 123 S.Ct. 2527.

Ruiz v. Dretke , No. SA-03-CA-303-OG, 2005 WL 2146119, at *14 (W.D. Tex. Aug. 29, 2005). The federal district court also held that the "fundamental miscarriage of justice" prong was not met in this case because there was no showing of actual innocence. Id. at *15.

Id. at *16.

Ruiz v. Dretke , No. SA-03-CA-303-OG, 2005 WL 2620193, at *1 (W.D. Tex. Oct. 13, 2005).

Dr. Munsinger was the mental health expert who evaluated Ruiz prior to trial.

Id. at *1-*2 (internal citations omitted).

Id. at *3.

Id. at *5.

Ruiz claimed that his Sixth Amendment rights were violated because his trial attorneys did not investigate mitigating evidence that might have resulted in a life sentence. Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and Wiggins v. Smith , 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ("Wiggins claim"). An inadequate sentencing-phase investigation can give rise to a Sixth Amendment claim under Wiggins .

Ex parte Ruiz , No. WR-27,328-03 (Tex. Crim. App. July 6, 2007) (not designated for publication).

Judge Holcomb filed a Dissenting Statement, joined by Judge Johnson. In this Dissenting Statement, Judge Holcomb opined that Ruiz "suffered a violation of his Sixth Amendment right to counsel not on one but at both the trial and the state habeas levels of proceedings." Id. (Holcomb, J., dissenting). Judge Holcomb noted Ruiz's application was his "final means to obtain any meaningful redress for the significant deprivation of his Sixth Amendment rights that he has suffered during the lower court proceedings in this State."Id. (Holcomb, J., dissenting).

Id. (Womack, J.). Judge Womack's statement was not labeled a "concurring" statement. Rather, it simply noted that Judge Womack was filing "a statement respecting the dismissal of the application." He stated Ruiz was alleging that his habeas counsel performed "badly by failing to raise [an IAC] claim in his first application," and that "[i]n such circumstances, ... the restriction on subsequent applications cannot be used to leave an applicant without a remedy." Id. (Womack, J.). According to Judge Womack, "this is a serious and unresolved question, but it is not presented in this case." Id. (Womack, J.). Judge Womack did not interpret Ruiz's application as presenting the question of "whether the unreasonable failure of a first habeas application to present meritorious claims could ever be surmounted in the courts of this State." Id. (Womack, J.).

Ruiz v. Quarterman , No. SA-03-CA-303-OG, 2007 WL 2437401, at *4 (W.D. Tex. July 10, 2007), rev'd , 504 F.3d 523 (5th Cir. 2007).

Id.

Ruiz v. Quarterman , 504 F.3d 523, 525 (5th Cir. 2007) (citing to the federal district court opinion, which stated that "Texas law precludes [Ruiz] from obtaining a ruling on the merits of his currently unexhausted claims ... in a successive state habeas corpus application").

Id.

Two of the nine judges on the Court at that time did not participate.

504 F.3d at 528.

Id.

Id.

463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (wherein the Supreme Court held "when the adequacy and independence of any possible state law ground is not clear from the face of the opinion, we will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so.").

504 F.3d at 527.

Id. at 527-28.

Id. at 532.

Id. at 524-527. The Fifth Circuit opined that this Court's summary dismissal could be interpreted as a rejection of the merits of Ruiz's ineffective assistance claim. It cited to Michigan v. Long , 463 U.S. 1032, 1040-41, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), which establishes that a state court dismissal of a federal claim is "on the merits" if "the adequacy and independence of any possible state law ground is not clear from the face of the opinion."

Id. at 528.

Unless otherwise noted, references made over the next several pages to the factual observations and findings, and legal conclusions of "the federal district court" came from Ruiz v. Thaler , 783 F.Supp.2d 905 (W.D. Tex. 2011).

On the occasions Ruiz presented his claims in federal district court he Ruiz was represented by attorneys experienced in state and federal habeas matters. See Ruiz v. Dretke , 2005 WL 2620193, at *1 and Ruiz v. Thaler , 783 F.Supp.2d at 910.

783 F.Supp.2d at 911.

Id. at 913.

Id. at 915, nn.2-3 ("In an opinion issued October 11, 2007, the Fifth Circuit concluded this Court erred in construing the Texas Court of Criminal Appeals' summary order of dismissal as a summary order of dismissal .... Thanks in significant part to the Fifth Circuit's remand order in this cause, federal habeas corpus petitioners in this Court have begun routinely asserting unexhausted claims as a matter of course, demanding stays and the abatement of their federal habeas corpus proceedings, often for years on end, so they can return to state court and pursue state habeas remedies which [sic ] regard to their unexhausted claims .... Notwithstanding its vague allusions to the Supreme Court's holding in Michigan v. Long , 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Fifth Circuit's remand order did not explain how the single concurring opinion issued by one of the seven Texas Court of Criminal Appeals judges who participated in [Ruiz's] second state habeas corpus proceeding somehow transformed that state appellate court's summary dismissal based on state writ-abuse principles into a decision 'on the merits' of [Ruiz's] underlying ineffective assistance claims.")

466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

783 F.Supp.2d at 911.

Id. at 912 (citing Wiggins , 539 U.S. at 521, 123 S.Ct. 2527 ).

Id. (citing Wiggins , 539 U.S. at 534, 123 S.Ct. 2527 ).

Id.

Molina testified at the habeas hearing that he and Ruiz abused alcohol and used marijuana almost daily when they lived together at an apartment. Molina claimed Ruiz abused LSD but admitted that he had never seen Ruiz do so. But Molina specifically denied that Ruiz was addicted to any drugs when they were residing together. 783 F.Supp.2d at 926.

Id. at 924.

Id. at 925 ("Other than [Ruiz's] own trial testimony, virtually all of the factual evidence now before this Court regarding [Ruiz's] drug abuse at the time of his offense comes from [Ruiz] himself and was related to this Court through Dr. Henry Munsinger's testimony and the largely hearsay testimony of Dr. Seth Silverman." (emphasis in original)).

Id.

Id. at 926.

Id. at 926-27 (emphasis in original).

Id. at 937-39.

Id. at 938 ("In short, once Dr. Munsinger informed [Ruiz's] trial counsel that he had discovered evidence suggesting [Ruiz] had been abused as a child, it was objectively unreasonable for [Ruiz's] trial counsel to have relied on the word of [Ruiz] and [Ruiz's] mother (who might well have possessed self-serving reasons for denying such abuse) in limiting the scope of their investigation into [Ruiz's] background.").

Id. at 939 ("Any reasonably proficient attorney confronted with conclusions similar to Dr. Munsinger's should have reasonably perceived the potential for discovering mitigating evidence through an investigation into [Ruiz's] background that went beyond merely interviewing [Ruiz] and his mother.").

Id. at 938.

Id. at 939 (citing and paraphrasing Wiggins by noting "the proper analysis under the first prong of Strickland is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time").

Id. at 940.

Id. (citing Wong v. Belmontes , 558 U.S. 15, 27, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) ).

Id.

Id. at 941 (citing Ruiz v. Dretke , 2005 WL 2146119, at *6 ).

Id.

Id. at 942. Griselda testified at the habeas hearing that she visited Ruiz in jail while he was awaiting trial, and he related to her that (1) one of the Rodriguez brothers was his friend, (2) this Rodriguez brother pressured Ruiz into committing the murder of Theresa Rodriguez, and (3) Ruiz took money from his victim's husband, used that money to acquire drugs, and used drugs extensively in the days leading up to the murder for the purpose of getting up the courage to commit the murder. But Griselda also testified that she had no personal knowledge that Ruiz abused drugs, and she had no personal knowledge of any physical abuse in the home.

Id. at 944-947.

Id. at 940 (emphasis in original).

Id. at 947.

Id. at 950 (citing Ruiz v. Dretke , 2005 WL 2146119, at *5, nn.27-30 ).

Id. at 949.

Id. at 950.

Id.

Id. (emphasis in original) (citing Skinner v. Quarterman , 528 F.3d 336, 342 (5th Cir. 2008) ).

Id. at 951-52.

Unless otherwise noted, references made hereinafter to the findings and conclusions of "the Fifth Circuit" came from Ruiz v. Stephens , 728 F.3d 416, 424-425 (5th Cir. 2013).

Ruiz v. Stephens , 728 F.3d 416, 424-425 (5th Cir. 2013) (internal quotation marks, citations, and alterations omitted).

Id. at 427.

Tex. Code Crim. Proc. art. 37.071.

Id. at 425.

728 F.3d at 427-428 (internal citations and footnotes omitted).

Ruiz v. Stephens , --- U.S. ----, 134 S.Ct. 2290, 189 L.Ed.2d 179 (2014).

539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

70 S.W.3d 103 (Tex. Crim. App. 2002).

"If a convicted person has no constitutional right to appointment of any counsel in a post-conviction habeas corpus proceeding, it inevitably follows that he cannot claim constitutionally ineffective assistance of counsel in that proceeding." Graves , 70 S.W.3d at 111 (citing, inter alia , Coleman v. Thompson , 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (because no constitutional right to counsel exists in a state death penalty habeas case, there can be no deprivation of effective assistance in that proceeding)).

Section 2(a) of Article 11,071 of the Texas Code of Criminal Procedure provides that "An applicant shall be represented by competent counsel ...". It almost seems as if the Legislature could have had someone like Ruiz's "egregiously deficient" habeas counsel in mind when it included the requirement of "competent counsel" in Article 11.071.

Clearly, the Fifth Circuit came up with an innovative way to allow for the merits of Ruiz's IAC claims to be addressed by the federal district court. Since then, the Supreme Court has decided Martinez v. Ryan , --- U.S. ----, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), and Trevino v. Thaler , --- U.S. ----, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013). In Martinez and Trevino , the Supreme Court recognized that, although ineffective assistance of habeas counsel may not constitute a constitutional violation, the issue of habeas counsel's performance is nevertheless relevant in a subsequent post-conviction proceeding when it answers the preliminary question of whether an underlying claim should be procedurally barred. In Martinez and Trevino , the Supreme Court acknowledged that the initial state habeas proceeding, if undertaken without the effective assistance of counsel, may not have been sufficient to ensure that proper consideration was given to a substantial IAC claim. Martinez , 132 S.Ct. at 1318 ; Trevino , 133 S.Ct. at 1919-20.

504 F.3d at 527-28.

Res judicata is the doctrine that an existing final judgment or decree, rendered on the merits by a court of competent jurisdiction, on a matter within its jurisdiction, is conclusive of the rights of the parties in all other actions or suits in the same court, or in any other judicial tribunal of concurrent jurisdiction, on points and matters in issue in the first suit. Davenport v. State , 574 S.W.2d 73, 76 (Tex. Crim. App. 1978) (implicitly overruled in part on other grounds by Ex parte Tarver , 725 S.W.2d 195 (Tex. Crim. App. 1986) ).

See generally Townsend v. Sain , 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (discussing circumstances in which a federal district court must grant an evidentiary hearing to a habeas corpus applicant).

A Lackey claim was developed from the case, Lackey v. Texas , 520 U.S. 1183, 117 S.Ct. 1465, 137 L.Ed.2d 568 (1997).

Smith v. State , 74 S.W.3d 868, 875 (Tex. Crim. App. 2002). See also Soffar v. State , No. AP-75363, 2009 WL 3839012, at *38 (Tex. Crim. App. Nov. 18, 2009) (not designated for publication).

Smith , 74 S.W.3d at 875.

Ruiz v. Dretke , No. SA-03-CA-303-OG, 2005 WL 2620193, at *1-*2.

In Buck , I recognized that my position was inconsistent with certain aspects of this Court's opinion in Ex parte Graves , in which it held that Article 11.071 does not guarantee a capital habeas applicant effective representation by appointed habeas counsel in an 11.071 proceeding and that claims surrounding ineffective representation by capital habeas counsel were not cognizable on post-conviction review. See Ex parte Graves , 70 S.W.3d 103, 117-18 (Tex. Crim. App. 2002). I disagreed with that opinion's analysis and indicated that I would overrule Graves "to the extent that it precludes consideration of a statutory claim [under Article 11.071 ] that initial habeas counsel's performance was so incompetent as to render the initial application frivolous and, therefore, void." Ex parte Buck , 418 S.W.3d 98, 103, 107 (Tex. Crim. App. 2013) (Alcala, J., dissenting). I further observed that, in light of the Supreme Court's reasoning in its recent opinions in Martinez v. Ryan and Trevino v. Thaler , the issue of habeas counsel's performance should be considered "relevant in a post-conviction proceeding when it answers the preliminary question of whether an underlying claim should be procedurally barred," even if that issue could not serve as a stand-alone basis for post-conviction relief. Id. at 109 ; see also Martinez v. Ryan , --- U.S. ----, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272 (2012) (permitting merits adjudication of otherwise procedurally barred substantial ineffective-assistance claim when that claim was forfeited as a result of errors by counsel in the initial state habeas proceeding); Trevino v. Thaler , --- U.S. ----, 133 S.Ct. 1911, 1919-20, 185 L.Ed.2d 1044 (2013) (applying rule of Martinez to federal habeas proceedings stemming from Texas state-court convictions).

This Court's majority opinion concludes that it is unnecessary to revisit its precedent in Graves in this case because, even were this Court to overrule Graves , it "would not help" applicant and is a "moot issue," in light of the federal district court's denial of federal habeas relief. For all of the reasons I have already explained, I disagree that the federal district court's denial of relief makes it unnecessary for this Court to evaluate applicant's Wiggins claim on its merits. Furthermore, to the extent that the majority opinion suggests that the doctrine of res judicata precludes this Court from evaluating applicant's Wiggins claim, I disagree with that assessment. At least with respect to federal-court review of state-court holdings in the habeas corpus context, it is well-established that the doctrine of res judicata is inapplicable. See Lehman v. Lycoming County Children's Servs Agency, 458 U.S. 502, 512, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982) (explaining that the interplay between state and federal habeas proceedings constitutes "a major exception to the doctrine of res judicata"); see also McCleskey v. Zant , 499 U.S. 467, 478-79, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In my view, the doctrine would also not apply to state-court habeas proceedings conducted after federal review of a claim.