In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00270-CR
_____

JEREMY NATHANIEL MILLER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 359th District Court
Montgomery County, Texas
Trial Cause No. 16-10-11685-CR

MEMORANDUM OPINION

A jury found Appellant Jeremy Nathaniel Miller guilty of retaliation. *See* Tex. Penal Code Ann. § 36.06(a)(1) (West 2016). Miller pleaded "true" to the enhancement paragraph in the indictment and elected to have the trial court assess punishment, and the trial court sentenced Miller to fifteen years of confinement. On appeal, Miller raises issues about the admission of certain evidence during the guilt or innocence phase of trial and the effective assistance of counsel during the punishment phase. We affirm.

1

## Background and Evidence

A grand jury indicted Miller for retaliation, and the indictment alleged that

> . . . on or about October 04, 2016, . . . [Miller] did then and there intentionally or knowingly harm or threaten to harm C. Gullo[1] by an unlawful act, to-wit: murdering C. Gullo, in retaliation for or on account of the service or status of C. Gullo as a public servant[.]

The indictment also included an enhancement for a previous felony conviction for assault family violence. Miller pleaded "not guilty."

### Testimony of Officer William Robinson

Officer William Robinson, a patrol officer with the Conroe Police Department, testified that he was on duty on the evening of October 4, 2016, and that he responded to a 911 call that evening about "an intoxicated individual walking in lanes of traffic." Robinson explained that Officers Tullos and Adams and Sergeant Lehman, who arrived at the scene before Robinson did, identified the individual as Jeremy Miller. Robinson testified that the location where the officers found Miller was "a really, really dangerous area[]" with heavy traffic, and he agreed it was a rough neighborhood. When asked to describe Miller that evening, Robinson explained that Miller was "having trouble standing erect by himself. He had a glossy look to his face. And the odor of alcohol was [e]mitting from his person." Robinson

---

[1] At the time of trial, the officer went by the name of C. Adams, while at the time of the offense, she went by the name of C. Gullo.

also described Miller as frustrated, tense, thick-tongued, and slurring his speech. Robinson agreed that the 911 caller had mentioned a bottle of vodka but the officers found no vodka but did find "a 40 ounce malt liquor type of beverage[]" in a large bottle.

Robinson agreed that he raised his level of aggressiveness in response to Miller's statement that "he was going to put cones in the freeway and kill a lot of people[]" and that Miller made other statements about murdering people. Robinson recalled that the last thing Miller said before being put into the patrol car was "I'll kill you[.]" Robinson agreed that Officer Adams transported Miller after his arrest.

Robinson identified State's Exhibit 7 as a recording that accurately reflected the scene as he observed it and as reflected by his body camera that night. State's Exhibit 7 was published to the jury.

Testimony of Officer C. Adams

Officer C. Adams, a patrol officer with the Conroe Police Department, testified that she responded to a call about an intoxicated and suspicious person and she made an arrest for public intoxication and retaliation. Adams explained that, upon arriving at the scene, she encountered a white male on a bicycle who matched the description the 911 caller had given and she identified the person as Miller. Adams testified that Miller seemed "[u]nhelpful[]" and intoxicated that night, he had

3

glassy and bloodshot eyes, slurred speech, and he appeared to be using his bicycle for support. She explained she was concerned for Miller's safety because the road had heavy traffic and he was not in a "very visible spot." Adams agreed that she felt he was a danger to himself and others, arrested him for public intoxication, handcuffed him, and put him in the back of her patrol vehicle.

Adams testified that she had a body mic and body camera on her that night. She identified State's Exhibits 5 and 6 as recordings from her body camera and her in-car camera that accurately depicted the scene that she witnessed that night. Adams explained that she asked Miller whether he had any weapons on him, he responded "I wish[,]" and she took his response as a threat that "he was going to kill a lot of people." She also agreed that Miller said "I'll kill you" to Officer Robinson when he put Miller into her patrol vehicle.

State's Exhibit 5, the video from Officer Adams's body cam showing the ride from the scene back to the jail, was published to the jury. Adams described the threats she received from Miller during the ride: "Threats to do a 30 car pile up on the highway with the cement truck. Threats to shoot me with my own gun. Threats to run my head through the cement. Threats to rape my children." Adams explained that she was concerned about the threats from Miller because of the intensity and specificity of the threats.

4

State's Exhibit 6, the video from Officer Adams's in-car camera, was also published to the jury. Adams explained that at one point, Miller said "[t]hat he was going to rape [her] child in front of [her] and slap [her] in the face." Adams also explained that, when she heard this from Miller, she was concerned about the possibility of encountering him after he was released because she and her family lived in the area. According to Adams, she was the only officer in the vehicle with Miller, and she had heard of officers being attacked and killed by handcuffed suspects in their own patrol car.

Adams agreed that she had reviewed Miller's Facebook account, and she recognized State's Exhibits 8 through 13 as images taken from Miller's Facebook page. Adams explained that some Facebook posts reflected that Miller was walking along the highway from Austin to the Conroe area, and she had heard Miller say he had walked from Austin. Adams also agreed that a post Miller made to Facebook after his arrest referred to Miller walking from Austin, and she agreed that a response to his post put Miller's conduct in context because the response suggested Miller was "off [his] meds again or [] using meth again[]" and the person posting the comment wrote that "[s]creen shots of all these posts being forwarded to the Court." Adams read another Facebook response written by Miller after his arrest in which he stated "there's a good chance that I'll murder someone[,]" and another statement

5

that he would "kill that cop, yes and you, and be happy doing it and rape her . . . kids out of spite[,]" and the post was consistent with the threats he made to her in the patrol car.

On cross-examination, Adams testified that Miller's level of intoxication suggested he was a danger to himself while in public. Adams described her contact with Miller as "pretty extreme[]" and testified that, as a police officer, although she had been in similar situations, she had not experienced anything "so personalized."

Testimony of Jeremy Miller

Miller testified that he did not mean any of the alleged threats nor did he have a conscious desire to follow through with them. Miller explained that he did not want to go to jail and he had bad experiences in jail in the past. According to Miller, he panicked and lost control and he did not realize what he had said until later.

Miller also testified that he has had bipolar disorder his whole life and he has an anxiety disorder. According to Miller, his bipolar disorder caused him to lose control and say the things that he said, and he had no intention of following through with the threats. Miller denied that the things he said to Adams had anything to do with her being a public servant. Miller explained

> I have made -- like I said, I have made a lot of threatening sounding statements in the past, but I did not mean any of them. They're all without merit. All of them. I've never followed through with any of

6

them. I never would. I never planned on it. It's just a bunch of -- I mean, I'm bipolar, depressed, lost control and said a lot of things.

Miller agreed that the recordings of him reflect that he told Miller he would murder her, he would shoot her with her own gun, and that he would harm her children and that, when he made these statements, he knew she was a police officer and he did not want to go to jail. Miller agreed that he was convicted of attempted retaliation in 2014 and in 2015 and that he was also convicted of attempted unlawful restraint. Miller also agreed that he had pleaded guilty to assault family violence, received deferred adjudication community supervision, and subsequently "failed that probation" and served time in prison.

Punishment Phase Evidence

After the jury found Miller guilty, the trial court heard evidence on punishment. Matthew Lynch, an officer with the Montgomery County Sheriff's Office and custodian of records, testified that he compiled business records about Miller. Lynch agreed that State's Exhibit 39 appeared to be a letter to Miller's aunt addressed from the jail by Miller when he was an inmate in 2017. Counsel for the State read the letter, which was "signed in blood[,]" aloud:

> . . . F U to[o]. I hope you and everyone burn in hell soon while I watch. I swear to you I will kill. You're lucky I didn't kill you when I last saw you or any of the rest of the fam[ily]. I hope you-all die.
>
>     . . . .

7

. . . I hope you all die a horrific death, tormenting death while I watch. F U. I hope you burn in hell. Die. Burn in hell.

Kayla Russell, a bond supervision officer with Montgomery County Adult Probation, testified that she was asked to supervise Miller and that she had received a threatening phone call from Miller. Keith Hebert, a supervising officer for a bail bonding business, testified that after he had invited Miller to his home for Thanksgiving, Hebert's roommate received a threatening phone call from Miller. Hebert also testified that he received a threatening letter from Miller in which Miller wrote "I hope you all die of a miserable slow death while I get to watch. There is a reserved spot in hell for all of you." Hebert explained that the letter caused him to be concerned for himself and other people in his office.

The State offered and the trial court admitted into evidence certified records of Miller's previous convictions for assault bodily injury in 2010 and 2012, criminal mischief in 2008, terroristic threat-family violence in 2010, interference with an emergency call in 2004, assault in 2004, and attempted assault against a public servant in 2015. The State also offered and the trial court admitted additional records from Miller's inmate file wherein the file documented notes from guards indicating that Miller threatened to kill someone, as well as certain Facebook posts from 2016 or 2017 in which Miller threatened to "kill" and "murder."

Miller testified that he had seen the presentence investigation. According to Miller, an older sister had prostituted him out to a neighbor, and he was abducted when he was about fourteen. Miller explained that he had done various basic labor jobs over the years, but that he now receives SSI benefits. According to Miller, bipolar disorder runs in his family, and sometimes he says he is going to kill "but all that is just words" and it is his defense mechanism because he has been assaulted a lot. He explained that the previously-admitted letter that he wrote and that was received by his bondsman was "[n]othing but words[]" and he did not mean any of it. On cross-examination, Miller explained that he had been prescribed antipsychotic medications, but he stopped taking them because of "bad side effects." Miller agreed that while he was in the Montgomery County Jail, he had to be moved to a "violent cell" on a couple of occasions.

Defense counsel asked the trial court to take judicial notice of the court's file about three mental examinations conducted to determine competency, and the court agreed to take judicial notice of the documents. In addition, all the evidence from the guilt or innocence phase was admitted without objection. The trial court also heard testimony about the mental health treatment and services that would be available to Miller in prison.

Admission of 911 Call

In his first issue, Appellant argues that the trial court erred in admitting State's Exhibit 4, a recording of the 911 call to the Conroe police dispatcher. According to Appellant, the 911 call was inadmissible as hearsay and its admission deprived him of his Sixth Amendment right to confront a witness against him.

At the hearing held by the trial court during trial but outside the presence of the jury, defense counsel objected to the admission of the recorded 911 call stating it "is testimonial in nature and denies . . . my client's rights to confront -- cross-examine the witness making the call." Defense counsel also argued that the person who made the 911 call stated that he was not reporting an emergency. The defense also referred to the 911 call as "hearsay testimony[.]"

The State's attorney explained that the 911 call concerned a report that someone was on a bicycle, was being disorderly, and was driving in the middle of the road where he could get hurt. The State explained that the recorded 911 call was offered "to show the reason for the arrest, the reason for the police contact[]" and the 911 call provided "information about the location and the identity of the person so the police could respond and make contact with that person for [the] safety of [] others." According to the State, when the police responded to the call, they made an arrest for public intoxication and during that arrest, the retaliation offense occurred.

Citing *Neal v. State*, 186 S.W.3d 690 (Tex. App.—Dallas 2006, no pet.),

*Kearney v. State*, 181 S.W.3d 438 (Tex. App.—Waco 2005, pet. ref'd), and *Dixon*

*v. State*, 244 S.W.3d 472 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd), the

trial court explained

> I will be looking at the following principles[,] that testimonial statements are official and formal in nature. That interaction with the police initiated by a witness or the victim is less likely to result in testimonial statements [than] if initiated by the police. That spontaneous statements to police are not testimonial. That responses to preliminary questions by police at a scene of a crime while police are assessing and securing the scene are not testimonial.

Citing *Sparks v. State*, 935 S.W.2d 462 (Tex. App.—Tyler 1996, no pet.), the trial

court also inquired whether the call might not be hearsay because it was not admitted

for its truth but to explain why the police acted as they did. The court overruled the

objections.

During the State's case in chief, the State offered the recorded 911 call into

evidence as State's Exhibit 4, and defense counsel stated on the record "No

objection, Your Honor." State's Exhibit 4 was admitted and published to the jury.

Confrontation Clause

The Confrontation Clause of the Sixth Amendment to the United States

Constitution prohibits the admission of testimonial statements of a witness who does

not appear at trial unless the witness is unavailable to testify and the defendant had

11

a prior opportunity to cross-examine the declarant. *Crawford v. Washington*, 541

U.S. 36, 53-54 (2004). The Supreme Court has explained

> Statements are nontestimonial when made in the course of police
> interrogation under circumstances objectively indicating that the
> primary purpose of the interrogation is to enable police assistance to
> meet an ongoing emergency. They are testimonial when the
> circumstances objectively indicate that there is no such ongoing
> emergency, and that the primary purpose of the interrogation is to
> establish or prove past events potentially relevant to later criminal
> prosecution.

*Davis v. Washington*, 547 U.S. 813, 822 (2006) (footnote omitted). We evaluate "the

declarant's statements, not the interrogator's questions[]" under the Confrontation

Clause. *Id.* at 822 n.1. The non-inclusive factors to be considered in determining

whether a statement is testimonial include:

> 1) whether the situation was still in progress; 2) whether the questions
> sought to determine what is presently happening as opposed to what
> has happened in the past; 3) whether the primary purpose of the
> interrogation was to render aid rather than to memorialize a possible
> crime; 4) whether the questioning was conducted in a separate room,
> away from the alleged attacker; and 5) whether the events were
> deliberately recounted in a step-by-step fashion.

*Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008) (citing *Davis*, 547

U.S. at 829-30). Whether a statement is testimonial is a constitutional legal question

that we review de novo. *See Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim.

App. 2010); *Wall v. State*, 184 S.W.3d 730, 742 (Tex. Crim. App. 2006).

12

Officer Robinson testified that the 911 call concerned a report of an intoxicated person in traffic in an area regarded to be dangerous and near heavy traffic. Officer Adams testified that the call reported the person as intoxicated and that usually 911 calls pertain to an incident in which the caller believes that police intervention might be necessary. Both officers testified that, when they arrived at the scene, Miller appeared intoxicated, he was having trouble standing, and he was next to a busy roadway. On these facts, we conclude that the 911 call was nontestimonial. The reported situation was still in progress and the primary purpose of the police at the scene was to assess the situation and render aid. *See Vinson*, 252 S.W.3d at 339. Nothing in the record suggests that the police interrogated the 911 caller to memorialize a possible crime or to prove past events for use in a later criminal prosecution. *Id.*; *see also Davis*, 547 U.S. at 822. We find no error in the trial court's decision to overrule the Confrontation Clause objection.

Hearsay

We review a trial court's admission of evidence for abuse of discretion. *See Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id.* We will not disturb a trial court's evidentiary ruling if it is correct on any theory of law applicable to the case. *See De La Paz v. State*, 279 S.W.3d 336,

13

344 (Tex. Crim. App. 2009). When the alleged error is not constitutional, we will reverse the trial court's judgment only if the error affected the appellant's substantial rights. *See* Tex. R. App. P. 44.2(b).

Assuming without deciding that Miller preserved error on his hearsay objection, we conclude that the trial court did not err in overruling the hearsay objection. Miller's counsel argued that the 911 call was a "welfare check[]" and not testimonial because the caller was not the victim of a crime. The State asserted that it was offering the 911 call to show the reason for police contact and the later arrest of Miller. The trial court overruled the objections made by Miller's attorney and noted on the record that a statement offered to show probable cause or the reason for an investigation is an exception to the hearsay rule because it is offered to show its effect on the listener and not for the truth of the matter asserted. The trial court did not abuse its discretion in admitting the 911 call. We overrule Miller's first issue.

Effective Assistance of Counsel

In Appellant's second issue, he argues that he was denied the effective assistance of counsel because his trial attorney failed to call Dr. Roger Saunders during the punishment phase of trial to testify about Appellant's mental health issues. According to Appellant, Dr. Saunders's testimony would have constituted

14

mitigation evidence, and "some elaboration" on Appellant's mental health and its effects on Appellant's conduct would have resulted in a more lenient sentence.

To establish that he received ineffective assistance of counsel, Appellant must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error(s), the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).[2] The party alleging ineffective assistance of counsel has the burden to develop facts and details necessary to support the claim. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). A party asserting an ineffective-assistance claim must overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 689). An appellant's failure to make either of the required showings of deficient performance or sufficient prejudice defeats the

---

[2] Appellant urges us to apply the standard set forth in *Ex parte Duffy*, 607 S.W.2d 507 (Tex. Crim. App. 1980). *Duffy* concerned a post-conviction application for writ of habeas corpus decided before *Strickland*. *Id.* at 508. We do not apply *Duffy* because the Court of Criminal Appeals overruled *Duffy* in favor of the *Strickland* standard. *See Hernandez v. State*, 988 S.W.2d 770, 770, 772 (Tex. Crim. App. 1999).

claim of ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

The right to effective assistance of counsel ensures the right to "reasonably effective assistance[,]" and it does not require that counsel must be perfect or that the representation must be errorless. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). The appropriate context is the totality of the representation; counsel is not to be judged on isolated portions of his representation. *See Thompson*, 9 S.W.3d at 813; *Solis v. State*, 792 S.W.2d 95, 98 (Tex. Crim. App. 1990). Isolated failures to object to improper evidence or argument ordinarily do not constitute ineffective assistance of counsel. *See id.*; *Ewing v. State*, 549 S.W.2d 392, 395 (Tex. Crim. App. 1977). Ordinarily, on direct appeal, the record will not have been sufficiently developed during the trial regarding trial counsel's alleged errors to demonstrate in the appeal that trial counsel provided ineffective assistance under the *Strickland* standards. *Menefield v. State*, 363 S.W.3d 591, 592-93 (Tex. Crim. App. 2012).

"Weighing the advantages and disadvantages of calling a particular witness to testify is a matter usually left within the province of trial counsel's discretion." *Ex parte Ruiz*, 543 S.W.3d 805, 821 (Tex. Crim. App. 2016) (citing *Ruiz v. Thaler*, 783 F. Supp. 2d 905, 949 (W.D. Tex. 2011)). When unadmitted mitigating evidence is

similar to admitted evidence, an appellant is unlikely to be able to show that the unadmitted evidence would have "tipped the scale" in his favor. *See Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

During the punishment phase, the trial court took judicial notice of the mental examinations conducted of Miller for the purposes of determining his competency to stand trial. Evidence from the guilt or innocence phase of trial was also admitted during the punishment phase. The forensic report of psychologist Ronald J. Massey, Ph.D. noted Miller's history of bipolar disorder, medication, and hospitalization. The trial court's file also included a Psychological Evaluation Report about Miller by psychologist Roger Saunders, Ph.D. Dr. Saunders's report noted that Miller "has a diagnosable mental illness, Bipolar Disorder[]" and that Miller had recently restarted antidepressant medication. At trial, Miller testified that he had been diagnosed with bipolar disorder, that bipolar disorder runs in his family, and that he has longstanding issues with anxiety and depression. Miller also testified that his bipolar disorder caused him to lose control and say things that would get him into trouble.

On appeal, Miller does not specify what testimony Dr. Saunders might have provided except that he might have testified regarding "some elaboration upon [Miller's] illness and its effects upon the Appellant's behavior[.]" Miller has failed to explain why the testimony by Dr. Saunders would not have been cumulative of

17

other mitigation evidence that was admitted during the punishment phase. A failure by trial counsel to introduce additional mitigation evidence that would have been cumulative does not establish prejudice under *Strickland*. *See Wong v. Belmontes*, 558 U.S. 15, 22-23 (2009); *Martinez*, 195 S.W.3d at 731; *Sincere v. State*, No. 11-11-00056-CR, 2013 Tex. App. LEXIS 2341, at *8 (Tex. App.—Eastland Mar. 7, 2013, no pet.) (mem. op., not designated for publication) (appellant did not establish that trial counsel was deficient for failing to present cumulative alibi testimony). Miller has failed to meet his burden under *Strickland*, and we overrule his second issue.

Having overruled both issues, we affirm the judgment of the trial court.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on August 23, 2018
Opinion Delivered September 26, 2018
Do Not Publish

Before Kreger, Horton, and Johnson, JJ.

18