In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-22-00230-CR
NO. 09-22-00231-CR
_____

**JONATHAN DAVIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause Nos. 20-36118 and 20-36119**

**MEMORANDUM OPINION**

Jonathan Davis appeals from judgments in trial court cause numbers 20-36118 and 20-36119, judgments that resulted from a consolidated trial before a jury on indictments alleging that Davis sexually assaulted *Grace* (a child), and that he engaged in an indecent

sexual act that involved *Grace*.[1] Davis appealed and filed separate briefs to support the two appeals. The briefs, however, raise the same issues and argue: (1) the judgments of conviction should be reversed because the evidence is insufficient to support them, and (2) he is entitled to be retried on the two indictments because he didn't receive the effective assistance of counsel in his trial.

Because Davis's arguments lack merit, we will affirm the judgments of conviction in the two causes from which Davis appealed.

## Procedural History and Background

In one indictment, the grand jury alleged that Davis intentionally or knowingly caused his sexual organ to contact Grace's anus (Cause Number 20-36118). In the other, the grand jury alleged that Davis engaged in sexual contact with Grace by touching her genitals with the

---

[1]To protect the victim's privacy, we have used pseudonyms for some of the names including the child's name. *See* Tex. Const. art. I, § 30 ("A crime victim has the . . . right to be treated with fairness and with respect for the victim's dignity and privacy."); Tex. Code Crim. Proc. Ann. art. 58.152 (providing for the use of pseudonyms in order to maintain confidentiality of files and records of victims of sexual assault). When a pseudonym is first used to substitute for a name, we have identified the name with italics.

intent to arouse a person's sexual desire.[2] Both indictments alleged that the offenses occurred on or about June 11, 2016. Several of Grace's relatives testified in the trial. *Rhonda* is Grace's mother. *Ella* is Grace's mother and Grace's grandmother. *Jim* is Grace's father. *Lily* is Jim's mother and Grace's grandmother. When the case was tried in 2022, Grace was eleven years old, she was eight years old when she claimed that Davis engaged in the acts that were at issue in the trial, and five years old in the summer of 2016 when the events on which the indictments were based occurred. As we will explain, the evidence supporting the jury's finding of penis-to-anal contact and supporting the jury's finding that Davis touched Grace's genitals hinges almost entirely on the sexual assault examination and testimony of the nurse who examined Grace in August 2019.

The case against Davis was tried in July 2022. Viewed in the light most favorable to the verdict, the evidence shows that Rhonda has known

---

[2]Tex. Penal Code Ann. § 22.021(a)(1)(iii) (aggravated sexual assault by contact); *id.* § 21.11(a)(1) (indecency with a child through sexual contact).

Davis since around 2014. According to Rhonda, who testified in the trial, her mother Ella has known the Davis "family forever."

During the trial, Rhonda testified that in the summer of 2015, she was living in a house in Beaumont with her children—Grace and *Kassi*—and her mother, Ella. That summer, after Rhonda learned that Davis needed a place to live, he moved to Rhonda's home.

By 2019, Davis was no longer living in Rhonda's home. But that summer, several members of Rhonda's family had gathered at Rhonda's house, and Davis stopped by. While Davis was there, Rhonda noticed that Grace had disappeared. According to Rhonda, before Davis left, she saw Grace "was in tears[.]" Rhonda told the jury that Grace told her to ask Davis to leave. In response, Rhonda said that she asked Grace to explain why. Grace told her, "[h]e just makes me feel uncomfortable." By Rhonda's account, Grace was "crying and shaking[,]" so she took Grace to Ella's room (Grace's grandmother) while she went to find Davis so that she could tell him that he needed to leave. Grace talked to Ella about what Davis had done.

After Davis left, Rhonda testified that she asked Grace whether she wanted to "talk to me about it." Grace declined. Rhonda explained that

4

because Grace had plans to leave town to go to her father's in Georgia for the holidays, she "sent her to her dad's and [ ] didn't do nothing at the time." Rhonda offered this excuse for not reporting Davis to authorities the day she claimed to have learned what Grace told Ella (Grace's maternal grandmother) about what Davis had done:

> [Grace] lies a lot but, I mean, I didn't think she was lying but I didn't want to just straight outright accuse somebody for something and you know, have their name – that title on his name or anything without proof or without being 100 percent sure that it was true.

The State also called Ella as a witness in the trial. That said, the prosecutor never asked Ella to state exactly what Grace told her in July 2019 when Rhonda took Grace to Ella's room. Instead, the prosecutor questioned Ella, as follows, and no one asked Ella to provide any further detail:

> Q. And when you met with [Grace] in your room, did she say anything to you about feeling uncomfortable?
> A. Yes.
> Q. Had you seen her like that before around the defendant?
> A. No, not till that day. But he wasn't coming to the house like 'cause he wasn't staying at the house anymore.
> Q. Yeah.
> A. So . . .
> Q. So, what did you do with the information that you got from [Grace]?
> A. I told him not to come back to my house anymore.

Q. And did he comply with that request?
A. Yeah. He wanted to know why but I couldn't tell him at the time[.]

Ella testified she didn't report Davis to authorities but gave the information that Grace gave her to Rhonda and cooperated with authorities when the authorities did later become involved.

Lily, Grace's paternal grandmother, testified about the circumstances that led to the involvement of the police. According to Lily, while Grace was in Georgia visiting her father, Grace told her that she had been sexually abused. Lily called authorities in Georgia, but they told her to give the authorities in Beaumont a call. Lily testified that she "called [the] Beaumont, Texas, police department and here we are." No one asked Lily to testify about what she told the police or what Grace told her, but Lily did testify that when Grace told her what happened, she was:

Shaking. She was nervous. Her whole world just fell apart when she told this to me, because she's been holding it in. And when it came out, she was – I have never seen her like that before.

Grace's father, Jim, testified that he found out about what Grace was alleging occurred from his aunt and that he immediately "dropped

6

everything" and went to "his aunt's house because my daughter was over there." According to Jim, Grace was crying, he tried to talk to her, but "she wouldn't talk to me about it[.]"

The State called Jennifer Luna, an employee of Garth House, which Luna explained provides "forensic interview, family advocacies, therapy, community outreach, and education[,]" in a six-county area in southeast Texas. Luna testified she conducts forensic interviews, described her credentials, and explained that she interviewed Grace in August 2019. Luna testified that Grace told her about the acts of sexual abuse that had occurred, that she named Davis as the perpetrator, and that Grace provided her with sufficient details of the abuse that she didn't feel it was necessary to interview other witnesses based on the information Grace provided. In any event, no one asked that Luna specify whether Grace told her the details of the alleged sexual acts, meaning whether there had specifically been penis-to-anus contact or whether Grace described to Luna that Davis touched her genitals. Rather, Luna's testimony shows after interviewing Grace, she had an understanding from what Grace

7

told her of what sexual acts occurred, but exactly what Luna's understanding was from the interview was never specifically addressed.[3]

The State called Detective Staci Landor, an investigator employed by the Beaumont Police Department, to explain why she charged Davis with two offenses on which the grand jury's indictments are based. Detective Landor testified that she watched Grace's interview with Jennifer Luna on a closed-circuit television, which is located just outside the room where the interview occurred. According to the detective, a defendant may be charged with having committed a sexual offense in different ways depending on the manner of penetration or touching and depending on exactly what party of a person's body the conduct occurs. For that reason, Detective Landor explained, children need to be as clear as possible in describing where they were touched. After the detective provided that background about the importance of a clear explanation by the child, the prosecutor asked:

> Q. So, if the child alleges genital-to-anal contact, is that sufficient for an aggravated sexual assault?
> A. Yes.

---

[3]There were also no records of the Garth House interview of the Garth House interview introduced into evidence in the trial, including the recording of Grace's interview.

Q. So, based on [Grace's] interview, what charge did you decide to file?

A. Aggravated sexual assault.

To be clear, however, Detective Landor never specifically testified that she heard Grace tell Jennifer Luna during her interview at Garth House that Davis touched her anus. Even so, Detective Landor explained that based on what she heard in Grace's interview, she moved forward with the case and had a sexual assault examination performed on Grace. After arranging for that to be done at St. Elizabeth Hospital, Detective Landor explained that she obtained the paperwork from the hospital on Grace's exam, determined the explanation Grace provided at the Garth House and the hospital were consistent about what occurred, and "move[d] forward with the case."

When Grace testified in the trial, she explained that when she was five or six years old, Davis sometimes stayed at her home. But Grace said she couldn't recall whether Davis lived there. Turning to Grace's testimony about the alleged sexual assault that resulted in Davis's indictment, Grace testified that one night Davis was babysitting her and her younger sister at their home. According to Grace, the three of them were in the living room, Grace and Davis were watching television while

9

Grace's sister was asleep in a chair, which reclined. Grace testified that she was sitting on the floor and that when she "got sleepy," she decided to lie down on the couch even though Davis was already lying down. While on the couch, Grace was lying on her side with Davis behind her. Grace stated that she was wearing shorts and explained that was the two of them were lying together on the couch:

> I felt him like, you know, like – like when you, like, you know – when you pull up your pants and stuff, you know, stuff like that, and then I felt him touching my pants and stuff and I asked him what he was he doing. He said he was fixing my pants but I knew he wasn't fixing my pants, but I was just scared to, like, do anything.
>
> Q. Okay. How did you know he wasn't fixing your pants?
> A. Because I felt it.
> Q. When you say you felt it, what do you mean? What's "it."?
> A. I felt he was touching me.
> Q. Okay. What part of his body was he using to touch you?
> A. His private part.
> Q. Okay. How did you know it was his private part?
> A. Because I felt it in my pants.
> Q. It was inside your pants?
> A. Yes, ma'am.
> Q. Was it – were you wearing underwear that day?
> A. Yes, ma'am.
> Q. Was it inside your underwear?
> A. I do not remember.
> Q. Okay. You could feel it touching you?
> A. yes, ma'am.
> Q. Was it touching you on your skin?
> A. Yes, ma'am – wait. I think so.

10

Q. Okay. Where was it touching you at?
A. On my butt.
Q. Like where the poop comes out on your butt.
 A. No, ma'am?
A. Just like just like – just like right there.
Q. Okay. Like was it, like, on your butt cheek; or was it kind of between your butt cheeks or –
A. On my butt cheek.
Q. Okay. And what was it doing?
A. Nothing.
Q. Nothing. Just touching?
A. Yes, ma'am.

Next, the prosecutor turned her attention to the information that Detective Landor obtained in her investigation, which the State relied on to charge Davis with indecency based on the act of touching Grace's genitals. The prosecutor approached the conduct alleged in the indictment this way, asking Grace:

Q. What was - - was he doing anything else with any other part of him?
A. No, ma'am.
Q. Was he touching you anyplace else?
A. I don't remember, but probably no.
Q. Do you remember if he said he was doing anything with his fingers before?
A. No, ma'am. Wait. What do you mean?
Q. Okay. Do you remember giving an interview with Ms. Luna at the Garth House?
A. Yes, ma'am.
Q. And do you remember telling a nurse what happened at St. Elizabeth?
A. Yes, ma'am.

Q. Okay. And at those time[s] - - those times it was awhile ago that you were telling them, right?
A. Yes, ma'am.
Q. Was your memory more clear back then?
A. Yes, ma'am.
Q. So, if you told Ms. Luna that the Garth House or if you told Ms. [Krummel] at St. Elizabeth that his fingers had been touching you on your private spot, does that help you remember?
A. A little bit.
Q. Do you remember today?
A. No, not all of it, just some of it because I kind of like don't want to think about it.
Q. Do you try to not think about it?
A. Yes, ma'am.
Q. Is it easier if it's just not in your mind?
A. Uh-huh. Yes ma-am.

Syrena Krummel is the nurse who performed the sexual assault exam on Grace in August 2019. Krummel testified that she is a registered nurse who is also certified as a sexual assault nurse examiner and that she has been employed by St. Elizabeth Hospital in that capacity since 2013.

Nurse Krummel explained that she obtained Grace's medical history "from the patient herself." Grace was eight years old when the SANE exam occurred. According to Krummel, Grace "gave a history of vaginal penetration and rectal penetration." On a ten-point scale, Grace rated her pain at "9" for both the vaginal and rectal penetrations that she

described. Grace named Davis as her assailant. That day, Grace denied any pain in her rectal and vaginal areas, but Grace rated her pain in those areas "a 9 out of 10" when Davis assaulted her.

Nurse Krummel explained that Grace detailed the assault through pictures and words. According to Krummel, Grace drew a picture that shows Grace and Davis lying on a sofa with Davis lying behind her. In describing the incident on the couch, Nurse Krummel's report states:

> And [Grace] said. What are you doing? And he said, I'm fixing your pants. And as soon as I got up, my ride pulled up. You know what boys use to use the restroom, that's what he used. He used it, put it in my pants. In one area (head buried in the chair covered with a stuffed animal). My butt. (P[atien]t turns the stuffed animal over and points to the area between his legs to indicate where he had put "it."). It hurt bad. So that's when I got up and my ride pulled up. On a scale of 1 to 10, 9. I hold in my tears sometimes. He had on some pants and a shirt like he always does. He started messing with my pants.
> . . .
> Forensic Nurse asked patient if anything else happened and again she puts her head into the chair and states, "He started like putting his fingers in my pants. Like in my front part. And that's when it started hurtin[g] really bad. He did the fingers first. Then the butt. And when it started hurting really bad that's when I got up and saw his peepee. It looked nasty.

Turning to Nurse Krummel's exam, she testified that she didn't find any injuries that were related to the penetrations Grace described. That said, Nurse Krummel explained she wouldn't have expected to find an

13

injury either because the incidents wouldn't have resulted in injuries, or had an injury occurred it would have healed before the exam was performed.

After the State rested, Davis called no witnesses to testify in his defense. The jury found that Davis was guilty of sexually assaulting Grace, and indecency with a child based on the allegations in the indictments. Based on the jury's punishment verdict, the trial court sentenced Davis to fifteen years' imprisonment on the conviction for sexually assaulting Grace and to five years' imprisonment on the conviction for indecency with a child.[4] The trial court further ordered that Davis serve the sentences consecutively.[5]

After the trial court signed the judgment, Davis moved for a new trial, alleging that he received ineffective assistance of counsel because

---

[4]Aggravated sexual assault of a child by contact and indecency with a child by contact are first and second-degree felonies, respectively. *See id.* § 12.32(a) (stating the punishment range for first-degree felonies is life in prison or any term not more than 99 years or less than 5 years), § 12.33(a) (stating the punishment range for second-degree felonies is no more than 20 years or less than 2 years in prison).

[5]*See id.* § 3.03(b) (creating an exception to the general rule, a rule that generally requires concurrent sentencing, that applies to the offenses the jury found Davis committed and given that Grace was not yet seventeen when the offenses occurred).

his attorney didn't call any witnesses to testify in his defense. To support his motion, Davis attached affidavits signed by six individuals. Generally speaking, these affidavits show that Davis's trial attorney knew the names of these witnesses before Davis's trial and knew that if called to testify, they would vouch for Davis's reputation, as the witnesses know him as a person who has morals and a good character.

In response to the affidavits, Davis's trial attorney filed an affidavit explaining that he believed it would serve Davis better to develop testimony from Rhonda and Ella than to call Davis's friends and members of his family to develop testimony that adults knew him to be a good person and trusted him to be around their children. According to Davis's attorney:

> At no point leading to [the] trial, did the maternal side of the complainant['s] family make any statements that were really damaging to the defendant and their testimony went much to what I anticipated. I was able to elicit testimony from the complainant's mother about her trust of the defendant, his caretaking ability with her children, the relationship and interactions of Mr. Davis and her children which lasted after the allege[d]offense occurred. Even that she did not believe [the] allegation when told to her by her daughter. I felt that concentrating on this and bringing it to the jury's attention in this way would be more impactful than how it could be perceived coming from members of his own family talking

about him with their children and also limit the possibilities of opening the door to rebuttal evidence.

The trial court denied the motion and Davis appealed.

## Is the evidence sufficient to support each of Davis's convictions?

Davis argues the State failed to meet its burden to prove its allegations beyond reasonable doubt that he sexually assaulted Grace by touching her anus with his penis or that he engaged in indecency with her by touching Grace's genitals. We examine claims that argue the evidence is insufficient to support a finding of guilt under the standards established in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[6] Under *Jackson*, we view the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[7] "The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses."[8] Thus, the jury may choose to believe some, all, or none of

---

[6]*See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).
[7]*Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 318-19).
[8]*Id.*

the testimony that the parties present to it in the trial.[9] The jury may also draw multiple reasonable inferences from the facts admitted into evidence as long as each inference drawn from the evidence is supported by the evidence admitted in the trial.[10] When the record supports conflicting inferences, we presume the jury resolved those conflicts in favor of its verdict, and we will defer to that determination.[11]

In our review, we consider all evidence admitted in the trial, whether or not it was properly admitted.[12] Circumstantial evidence is just as probative as direct evidence of a defendant's guilt, and "'circumstantial evidence alone can be sufficient to establish guilt.'"[13] When the cumulative force of the incriminating circumstances allows the jury to rationally infer the defendant committed the crime, the evidence is still sufficient to support a conviction even though each fact doesn't directly point to the defendant's guilt.[14] After deferring to the jury's role

---

[9]*Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).
[10]*Temple*, 390 S.W.3d at 360.
[11]*Id*.
[12]*Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
[13]*Temple*, 390 S.W.3d at 359 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).
[14]*Id*. (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)); *Hooper*, 214 S.W.3d at 13.

as the factfinder, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any of the essential elements of the offense based on a hypothetically correct charge.[15]

We turn first to Davis's argument that the evidence is insufficient to support his conviction for sexually assaulting Grace. In trial court cause number 20-36118, the State was required to prove that (1) Davis intentionally or knowingly (2) caused his sexual organ to contact (3) Grace's anus when (4) Grace was not yet fourteen years of age.[16] Since the Penal Code doesn't include a definition for the word *contact*, the jury was free to assign the word "any meaning which is acceptable in common parlance" in deciding whether the State proved that Davis's penis *contacted* Grace's anus.[17]

On appeal, Davis argues that Grace,

> specifically recanted the hearsay statements of [Nurse Krummel and Jenifer Luna] at the trial before the jury. Her testimony to the jury describing the event was coherent and detailed and clearly failed to describe the offense of "aggravated sexual assault." Nowhere in her testimony did

---

[15]*See Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018).

[16]Tex. Penal Code Ann. § 22.021(a)(1)(B)(iv), (a)(2)(B).

[17]*Kirsch v. State*, 357 S.W.3d 645, 650 (Tex. Crim. App. 2012).

18

she claim that [Davis's] sexual organ contacted her anus, but merely touched her butt cheek and not even between her butt cheeks.

We disagree with Davis that Grace recanted her prior statement, as she never testified in the trial that she wasn't telling Nurse Krummel and Jennifer Luna the truth when they spoke to Grace in 2019 about what Davis had done to her in 2016 when Grace would have been five years old. When a witness says they can't recall an event in a trial but there is evidence before the jury that the witness did recall the event in a statement made to others at some time before the trial occurred, it's up to the jury to decide whether it wants to believe what the witness said in the earlier statement, even if it wasn't made in a court.[18] Here, the jury could have decided that Grace—an eleven-year-old child when the trial occurred—just didn't recall the details at trial but instead gave the details to Nurse Krummel in 2019. Or the jury could have rationally decided that Grace was too shy to tell the jury where exactly Davis

---

[18]*Chambers*, 805 S.W.2d at 461 (holding that "the complainant's recantation of her videotaped testimony did not destroy its probative value"); *Saldana v. State*, 287 S.W.3d 43, 50 (Tex. App.—Corpus Christi 2008, pet. ref'd) ("A fact finder is fully entitled to disbelieve a witness's recantation.").

touched her and with what parts of his body, but she did provide that detailed information to a nurse a few years before in a medical setting because the medical setting was more conducive to a child's telling an adult what occurred.

In reviewing the evidence, our role is not to reweigh the evidence and then substitute our own opinion for that of the jury.[19] Rather, we must defer to the jury's role as it could have believed Grace told Nurse Krummel the truth about what Davis did to her during the sexual assault exam that Nurse Krummel performed in 2019. Stated another way, Grace's inability to provide the jury with the same detailed account she gave Nurse Krummel in 2019 doesn't destroy the probative value of the account Grace gave Nurse Krummel in 2019 since the jury chose to rely on that account in deciding whether the State had proved beyond reasonable doubt that Davis sexually assaulted Grace. Consequently, the jury could have rationally believed that Grace described what Davis did to her and inferred from the information she provided to the nurse that Davis caused Grace's anus to contact his penis. Thus, the evidence

---

[19]*Temple v. State*, 390 S.W.3d at 360.

admitted in the trial supports the jury's anus-to-penis contact finding—the conduct proscribed by Penal Code section 22.021(a)(1)(B)(iv).

As to the remaining elements of the offense, Davis doesn't dispute that Grace was not yet fourteen when the alleged sexual assault occurred. When viewed in the light most favorable to the prosecution, Grace's description of how Davis's penis entered her pants also allowed the jury to reasonably find beyond reasonable doubt that Davis engaged in the conduct intentionally or that he did so knowing his penis would contact Grace's anus. We hold the evidence before the jury is sufficient to support the elements of the offense the State had to prove to establish Davis sexually assaulted Grace in trial court cause number 20-36118.

Next, we turn to Davis's claim that the evidence is insufficient to support his conviction for indecency with a child. In trial court cause number 20-36119, the State was required to prove that (1) Davis contacted Grace's genitals (2) intending to arouse or gratify his sexual desire (3) when Grace was not yet seventeen.[20]

---

[20]Tex. Penal Code Ann. § 21.11(a)(1), (c)(1).

Davis argues the evidence cannot support his conviction for indecency because "nowhere in her testimony did she claim that [Davis] touched her genitals as alleged." He notes that Grace's testimony "contradicted the claims of other witnesses that she had made a prior inconsistent statement with her trial testimony. But Nurse Krummel's report and her testimony reflect that Grace told her that Davis put his fingers in her pants, [l]ike her front part[,]" and that's "when it started hurting really bad[.]" Even though testimony about a vaginal penetration wasn't required to prove Davis committed the offense of indecency by contact with Grace's genitals, Nurse Krummel explained that with the benefit of pictures and a stuffed toy, Grace "gave a history of vaginal penetration[.]"

Viewing the evidence as a whole and in the light most favorable to the prosecution, the jury could reconcile the inconsistencies in Grace's trial testimony and rely on the statement Grace provided to Nurse Krummel in 2019. That statement allowed the jury to reasonably find that Davis contacted Grace's genitals. At trial, Grace never said that what she told Nurse Krummel wasn't true; instead, she told the jury that her recollection of what happened to her in 2016 was better in 2019 when

22

she spoke to Nurse Krummel than it was when the trial occurred, which was in July 2022. We conclude the discrepancies between Grace's ability to recall the events in 2022 and when Nurse Krummel examined her in 2019 do not destroy the probative value of the statement that she gave to the nurse.[21]

Davis doesn't argue the evidence is insufficient to support the jury's findings on the remaining elements required to prove he was guilty of indecency with a child. For instance, he doesn't dispute that Grace was not yet seventeen when the offense occurred. He also doesn't argue that the evidence doesn't support the jury's finding that his purpose in touching Grace's genitals was to arouse his sexual desire, as no other evidence in the trial shows that he had another purpose for touching her there. We hold the evidence is sufficient to support the jury's finding convicting Davis of indecency with a child in trial court cause number 20-36119.

---

[21]*Chambers*, 805 S.W.2d at 461.

## Did Davis establish that he received the ineffective assistance of trial counsel?

Davis's remaining issue, which is raised in both appeals, contends Davis received ineffective assistance of counsel in the guilt-innocence phase of his trial. The right to effective assistance of counsel is guaranteed by the United States and Texas Constitutions.[22] That right necessarily includes the right to reasonably effective assistance of counsel.[23] To prevail on a claim of ineffective assistance, however, a defendant must prove (1) counsel's representation fell below an objective standard of reasonableness, and (2) a reasonable probability that, but for counsel's deficiency, the result of the proceeding would have been different.[24]

To prove deficient performance, the defendant must prove by a preponderance of the evidence that his attorney's performance fell below an objective standard of reasonableness.[25] There is a "strong presumption

---

[22]U.S. CONST. amend. VI; Tex. Const. art. I, § 10.

[23]*See Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986) (applying the *Strickland* standard to ineffective-assistance-of-counsel claims under the Texas Constitution).

[24]*See Strickland*, 466 U.S. at 687-88; *Hernandez*, 726 S.W.2d at 55.

[25]*Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011).

that counsel's conduct fell within the wide range of reasonable professional assistance."[26] Therefore, to overcome the presumption, any allegation of ineffectiveness must be firmly grounded in the record so that the record affirmatively demonstrates no plausible professional reason for counsel's specific acts or omissions.[27]

Davis argues he received ineffective assistance in the guilt-innocence phase because the attorney who represented him in his trial failed to call witnesses who were "ready, willing, and available to testify on his behalf." As mentioned, an attorney on Davis's behalf moved for a new trial, supporting the motion with six affidavits that were signed either by members of Davis's family or his friends.[28] The attorney who represented Davis in the trial responded with an affidavit of his own, and

---

[26]*See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 689).

[27]*Prine v. State,* 537 S.W.3d 113, 117 (Tex. Crim. App. 2017).

[28]We note that the motion for new trial was not filed by the attorney the trial court appointed to represent Davis in his trial or by the attorney the trial court appointed to represent Davis in his appeal. Nonetheless, the trial court denied the motion, even though the docket sheet doesn't show the trial court ever recognized that the attorney who signed the motion for new trial was Davis's attorney of record. Nonetheless, since the trial court ruled on it, we consider the motion is properly before us for the purposes of Davis's appeal.

it contains the reasons that Davis's trial attorney chose not to call the individuals who signed the affidavits as witnesses in the guilt-innocence phase of Davis's trial. Boiled down, the affidavit filed by Davis's trial attorney shows that he thought he could elicit favorable testimony about Davis's character through Grace's mother and grandmother. That strategy was designed to allow the jury to hear about Davis's character from Rhonda and Ella, the adults who had allowed Davis to live in their home because they trusted him around children. The advantage of the strategy was that it eliminated the risk of calling witnesses who might have information damaging to Davis's reputation while allowing the jury to hear that the adults living with Davis in the home trusted him around Grace and Grace's sister the entire time he lived there.

Davis's trial attorney successfully elicited favorable testimony from Grace's mother (Rhonda) and Grace's grandmother (Ella) in the trial. Both testified that when Davis lived with them, they never saw Davis act inappropriately while around Grace. Rhonda testified that Grace loved being around Davis and that before Davis came to their home in 2019 and she found Grace crying, Grace never seemed uncomfortable when Davis was around. Ella testified that when Davis was around Grace, she

26

trusted him and that before the incident in 2019, she had never viewed Davis as a threat.

The information in the six affidavits that Davis claims he wanted to introduce about his good character is similar to the evidence his trial attorney elicited in the trial from Rhonda and Ella.[29] Davis's trial attorney also offered a reasonable basis grounded in trial strategy for not calling the witnesses that signed the affidavits since by not calling them he eliminated his client's risk of opening the door to evidence that might have been adverse to Davis's defense.[30]

Davis also argues that his attorney was ineffective because he failed to call a man named Jack Garrett to testify that Rhonda had falsely accused him of sexually assaulting her. Yet Davis's trial attorney explained why he didn't call Garrett in his affidavit and why he believed that strategy would either fail or "cause more harm than good." According

---

[29]*See Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006) (When unadmitted mitigating evidence is similar to admitted evidence, a defendant is unlikely to show that the unadmitted evidence would have "tipped the scale" in his favor.).

[30]*See Ex parte Ruiz*, 543 S.W.3d 805, 821 (Tex. Crim. App. 2016) ("Weighing the advantages and disadvantages of calling a particular witness to testify is a matter usually left within the province of trial counsel's discretion.").

to Davis's trial attorney's affidavit, had the trial court allowed testimony about Garrett's alleged assault, Rhonda would have had to admit that Garrett denied engaging in the acts that Rhonda described and to admit he was never charged with a crime. Davis's trial attorney concluded that "nothing [is] clear cut that would show that [Garrett] was lied on. I felt putting a lot of energy into this theory would be chasing a 'red herring.'"

To prove a claim of ineffective assistance of counsel, the defendant must prove the attorney who represented the defendant performed deficiently and the defendant suffered prejudice as a result.[31] Courts must measure whether the attorney was ineffective using an objective standard of reasonableness, which turns on whether the attorney represented the defendant in a manner that fell below the prevailing professional norms.[32] Different attorneys may reasonably make different choices in handling a defendant's case and the attorney's and the client's choices in a particular case usually involve matters of trial strategy.[33]

---

[31]*Strickland*, 466 U.S. at 687; *Ex parte Bowman*, 533 S.W.337, 349 (Tex. Crim App. 2017); *Ex parte Torres*, 483 S.W.3d 35, 43 (Tex. Crim. App 2016).

[32]*Id*.

[33]*Nava v. State*, 415 S.W.3d 289, 307-08 (Tex. Crim. App. 2013); *see also Strickland*, 466 U.S. at 689; *Bowman*, 533 S.W.3d at 349.

Consequently, the standard by which an attorney's representation is measured recognizes the wide range of reasonable professional assistance that exists, so appellate courts indulge in a strong presumption that favors the attorney whose advice is the subject of a defendant's ineffective assistance claim.[34]

In deciding whether Davis was entitled to a new trial, the trial court could have reasonably concluded that for reasons of trial strategy, the attorney who represented Davis chose not to call the six character witnesses who signed the affidavits that were used to support Davis's motion. The record shows Davis's trial attorney developed evidence favorable to Davis's character through Grace's mother and Grace's grandmother during the trial. The trial court could also reasonably conclude that not calling Jack Garrett to testify was a reasonable choice as a matter of trial strategy, so not calling Garrett isn't conduct that amounts to ineffective assistance of counsel.[35] We hold the trial court did not abuse its discretion in denying Davis's motion for new trial.

---

[34]*Id.*
[35]*See id.*

## Conclusion

We overrule the issues Davis raises in his two appeals. We affirm the trial court's judgments in trial court cause numbers 20-36118 and 20-36119.

AFFIRMED.

HOLLIS HORTON
Justice

Submitted on August 1, 2023
Opinion Delivered October 11, 2023
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.